## Good Fellowship Ambulance Club's Appeal.

466

Argued January 4, 1962. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN and O'BRIEN, JJ.

*Robert W. Lentz,* with him *Reilly, Fogwell & Lentz,* for appellant.

*William H. Mitman,* with him *Stively and Mitman,* for intervenors.

OPINION BY MR. JUSTICE MUSMANNO, March 13, 1962:

The Good Fellowship Ambulance Club of Chester County is a Pennsylvania nonprofit corporation dedicated to philanthropy and charity. It is made up of

men inspired with the spirit of the Biblican Samaritan who succored the wounded traveler. These men keep themselves ready at all times to drive ambulances to help those who have been injured by conflagration, accident or other disaster or who may be in need of ambulance service because of other emergencies. They perform these services without compensation.

When the beneficiaries of the Club's activities are able to pay for services rendered, the money is used to help maintain the organization. If they are unable to pay, the work is performed with equal zeal in the name of pure charity. Even when beneficiaries indicate a capacity to pay, one-third of the bills submitted are not collected and at the end of each year, all bills are burned in the fires of forgetting and starting anew.

The Club maintains headquarters at 225 South Walnut Street in West Chester where two ambulances are under roof, one is constantly on the alert on the street, and a fourth is kept in a used-car lot in the immediate vicinity. The needs of the community having augmented in volume, the Club recently felt obliged to acquire more extensive quarters and additional equipment. Arrangements were accordingly made with an Anthony W. Morelli to purchase from him a certain property in West Goshen Township which would permit the erection of a new ambulance garage large enough to accommodate additional ambulances together with emergency equipment such as oxygen tanks, fracture table, extra stretchers and motor accessories. The vehicles to be stored at this new site would be auxiliary or reserve ambulances to be called into use only when the West Chester ambulances would be unavailable.

Since the property in question is located in an area zoned "A Residence," it became necessary to obtain a special exception under the provisions of the applicable West Goshen Township zoning ordinance. An applica-

tion to obtain such an exception was made but it was refused by the township board of adjustment on the basis that the intended use would be adverse to public interest and that it "would have a depreciating effect upon the value of buildings in the area."

The club appealed to the Court of Common Pleas of Chester County which held that that section of the ordinance which allowed the granting of special exceptions was an unconstitutional delegation of power because it failed to set forth sufficient standards to determine the granting or refusal of exceptions. The Court also decided that the club was not entitled to a variance because there was no showing that there was "an unnecessary hardship unique or peculiar to the property involved as distinguished from the impact of the zoning regulations on the entire district."

An appeal to this Court followed. Section 501 of the West Goshen Township ordinance provides that: "A building may be erected, altered or used, and a lot or premises may be used for . . . (4) Any of the following purposes when authorized as a special exception by the Board of Adjustment in accordance with Article XII of this Ordinance: A. Educational, religious, or philanthropic use, excluding correctional or penal institution."

Section 1201 of the Ordinance states that "The Board shall have the following powers . . . To hear and decide special exceptions to the terms of this Ordinance, in such cases as are herein expressly provided for, in harmony with the general purposes and intent of this ordinance with power to impose appropriate conditions and safeguards." The "purposes and intents" thus referred to are set forth in Section 101 as follows: "This Ordinance is enacted for the following purposes: to promote the health, safety, morals, and the general welfare of the Township of West Goshen by lessening congestion in the streets, roads, and highways, securing

safety from fire, panic, and other dangers, providing adequate light and air, preventing the overcrowding of land, avoiding undue concentration of population, facilitating the adequate provisions of transportation, water, sewerage, schools, parks, and other public requirements, and encouraging the most appropriate use of land throughout the Township."

It would appear from a reading of this section that the learned Court below was unnecessarily concerned lest the Board might have no lantern to guide its deliberations in granting or refusing exceptions and therefore could get lost in the swamps of indecision and ambiguity. The lantern however is there shining with exceptional brightness. Health, safety, morals, general welfare, lessening of congestion, facilitation of transportation, water, and education are some of the beams of this lamp of direction. In fact, the standards there set out are more specific than those upheld by us in *Archbishop O'Hara's Appeal*, 389 Pa. 35, where, in considering an ordinance enacted by Cheltenham Township in Montgomery County this Court, speaking through Justice JONES, said: "Section 301 (3) and 1201 (b) standing alone would indicate that the board is granted an unlimited and unfettered and, therefore, invalid discretion. However, section 1413 of this ordinance provides, inter alia: 'In interpreting and applying the provisions of this Ordinance they shall be held to be the minimum requirements for the promotion of the health, safety, morals and general welfare of the Township.' It is this section which provides sufficient appropriate conditions and safeguards controlling the board's discretion to render valid the ordinance: Medinger's Appeal, 377 Pa. 217, 221, 104 A. 2d 118 and cases therein cited. Within the terms of this section appear basic standards and a definite policy and rule of action sufficient for the guidance of the board in the exercise of its discretion: Katzin v. McShain,

371 Pa. 251, 89 A. 2d 519. A reading of the ordinance in its entirety is convincing of its validity.[5]

"[5] There is a presumption as to the validity of this ordinance . . . In construing this ordinance we adopt that interpretation which will prevent any conflict with the Constitution: Fidelity-Philadelphia Trust Co. v. Hines, 337 Pa. 48, 10 A. 2d 553; Hotel Casey Co. v. Ross, 343 Pa. 573, 23 A. 2d 737."

The above-stated observations are equally applicable to the terms of the West Goshen Township ordinance.

The learned Court below quoted from the *Devereux Foundation, Inc., Zoning Case,* 351 Pa. 478, as follows: "As far as the terms of the Easttown Township ordinance appear in the record there are no rules therein contained in accordance with which special exceptions may be made," and then concluded that this statement compelled it to its decision because the preamble in the Easttownship zoning ordinance and section 101 of the West Goshen Township Zoning Ordinance are practically identical. However, it is to be noted that in the *Devereux* case we did not elaborate on our statement that "As far as the terms of the Easttown Township ordinance appear in the record there are no rules therein contained in accordance with which special exceptions may be made." for the reason that we did not base our decision on that fact, having concluded that the matter was one of variance and not of special exception. It is also to be noted that the preamble of the Easttown ordinance in the *Devereux* case was not there brought before the Court for consideration or even made a part of the printed record which quoted the "Relevant" sections of the zoning ordinance.

We, therefore, decide that the *Devereux* decision is not here governing, and that the West Goshen Township ordinance constitutionally provides for the granting of a special exception in harmony with the pur-

poses and intent of the Ordinance as clearly set forth in section 101 and that adequate safeguards against boundless discretion is properly limited by that section.

We now come to the question as to whether the board abused its discretion in refusing the requested special exception. The board held that to allow the erection and use of the contemplated building would create traffic hazards and that a building of the type described "would be out of character with the type dwelling houses which are found in this immediate area." A reading of the record suggests that the board's fears were more illusory than real.

Complaint was made that the use of the ambulance siren would disturb the calm and tranquility of the neighborhood. Even if such a cry of hurrying aid to distressed humanity would momentarily rend the air of repose of any community, surely that instant of annoyance (if annoyance it could be) would be a small price to pay for the contentment that should come to every soul that a suffering fellow creature of the human race is not lying unattended along the highway of life's injuries. The facts are, however, that the siren would not be excessively used and would not be sounded any more frequently than it would be sounded by ambulances coming into the area on emergency calls from elsewhere. In addition, statistics show that only once in every five calls would conditions necessitate the sounding of the siren at all, and that only 20% of the calls are made at night. It is to be repeated also that the ambulances in this new building would be employed only when the ambulances at the main headquarters would not be available.

In the *O'Hara* case, objection had been made to the use of the land for a school on the basis that this use would increase traffic which would create dangers and hazards adverse to public safety. What was excellently

said in reply to that contention by Justice BENJAMIN
R. JONES could well apply here, namely, "The ordinance
which classifies this area as an 'AA' residential district
specifically provides that land situated therein may be
used for 'educational, religious and philanthropic' pur-
poses. The use of the land for *any* such purpose would
naturally result in an increase in traffic and the fram-
ers of this ordinance certainly must have taken heed of
this factor in the preparation of the ordinance . . . *Any*
traffic increase with its attendant noise, dirt, danger
and hazards is unpleasant, yet, such increase is one
of the 'inevitable accompaniments of suburban progress
and of our constantly expanding population' which,
*standing alone,* does not constitute a sufficient reason
to refuse a property owner the legitimate use of his
land . . . It is not *any* anticipated increase in traffic
which will justify the refusal of a 'special exception' in
a zoning case. The anticipated increase in traffic
must be of such character that it bears a *substantial*
relation to the health and safety of the community. A
prevision of the effect of such an increase in traffic
must indicate that not only is there a likelihood but a
high degree of probability that it will affect the safety
and health of the community, and such prevision must
be based on evidence sufficient for the purpose. Until
such strong degree of probability is evidenced by legally
sufficient testimony no court should act in such a way
as to deprive a landowner of the otherwise legitimate
use of his land." (Emphasis in original)

Is the Good Fellowship Ambulance Club a philan-
thropic enterprise? What could be more philanthropic,
charitable and conducive to public welfare than rapidly
transporting the grievously injured, the seriously ill
and those disabled in common disasters, to hospitals
and immediate medical care? The record reveals that
the Good Fellowship Ambulance Club has written a
record of selfless and heroic service worthy of the

gratitude of the community. The services of the club are rendered to all those who need them, regardless of race, color or creed. Dominic J. Mastrangelo, president of the club, was asked at the board hearing to indicate the variety of cases the club had had in the past few years. His answers are revealing: "A. If [those present at the hearing] are all residents West Goshen I don't think there's much I can say, what they have heard about the club. Regardless of the hour of the day, we are on the job, whether it is maternity, whether it is accidents, whether it is suicide, when you want us we are available. Some of the jobs, we have had in the past ten years—I don't believe I have to refresh your memory, the accident on 322 where there were a couple people killed, the fire on Bolmar Street where I got three bodies out of there. There is no use going through that . . . Q. . . . . Can you tell us anything that happened during the bad snowstorm we had several years ago? A. Well, besides being able to get nurses to the hospital or on the job, I think there was a busload of children lost and the Good Fellowship Ambulance found out about it. We went out, went as a group, located it, and stuck with it until every child got home. That's something that's not covered by ambulance service but anytime there's need for any help we are there . . . A lot of people have to go up for x-ray, somebody has to be moved from one room upstairs to downstairs, anything where people are stuck and need somebody, just call for 204 and we are there . . . Q. Do you perform any other services to the community at public gatherings and things of that nature? A. Yes. Any gathering, football games, baseball games, anything at all, we supply free ambulance service. Q. There is no charge made for that? A. No. Q. Do you also supply first aid service and things of that nature? A. We do."

A reading of the testimony can only stir gratification in the realization that despite current cynical observations to the contrary, there is a great deal of benevolence in the world. The members of the ambulance club not only receive no pay but often do not even get expense money for food and lodging when they must make long trips, as for instance, to New York. Whatever is paid to them in the form of gratuities goes into the "engineers" fund, which is used to buy uniform jackets for the members. As Mastrangelo testified, that is the most they get in the way of material return, "a jacket maybe every four years."

The riddle as to how anybody could possibly object to so worthy an objective as the request for a special exception in this case is solved by one protestant who said that the ambulance drivers might play cards in the new building. He did not enlighten the board on how an innocent diversion in cards while waiting out the night-vigil for calls from the wounded and the marooned could possibly disturb anybody without so keen a hearing as to be disturbed by the shuffling of cards in a room within thick walls in a building many hundreds of feet away.

Another objection made was that the backing out of ambulances could cause traffic hazard, but the plans of the building show that its driveway will be so constructed that ambulances will come out front first.

As to the argument that the proposed building would not be in conformity with the aesthetic domiciliary standards of the neighborhood and would possibly depreciate the value of surrounding buildings, we repeat what was admirably noted by Chief Justice BELL in *Medinger Appeal*, 377 Pa. 217: "The natural or zealous desire of many zoning boards to protect, improve and develop their community, to plan a city or a township or a community that is both practical and beautiful, and to conserve the property values as well

as the 'tone' of that community is commendable. But they must remember that property owners have certain rights which are ordained, protected and preserved in our Constitution and which neither zeal nor worthwhile objectives can impinge upon or abolish . . . '. . . A home owner cannot be deprived by zoning of a right to use his own property as he wishes merely because a zoning board believes that what he intends to erect is not artistic or aesthetic:' [citing cases] . . . We therefore hold that neither aesthetic reasons nor the conservation of property values . . . are . . . sufficient to promote the health or the morals or the safety or the general welfare of the township . . ."

A study of the entire record can lead to but one conclusion and that is that the board abused its discretion in refusing the club the special exception which would permit the erection of the building in question. It must be remembered, as stated in *O'Hara*, that "The burden was not upon the appellant to establish that the proposed use would not adversely affect the health, safety, and morals of the community:" On the contrary the club was entitled to the special exception unless there was legally sufficient competent evidence to support a finding that the granting of such exception was adverse to the public interest.

The order of the court below is accordingly reversed and the board of adjustment is directed to authorize the proposed use of the premises by the appellant club. However, in view of the fact that the record indicates that the planned structure would have a capacity for 15 ambulances and the use of such a number of vehicles could result in a serious increase in traffic which would bear a "substantial" relation to the health and safety of the community, the board is directed, in accordance with the authority contained in section 1201 of the ordinance, to impose conditions with regard to the number of ambulances to be housed in the building. However,

it is added that although the club will be satisfied with but four additional ambulances at present, any restriction imposed by the board should not prevent the club from applying for the use of additional vehicles when conditions and circumstances warrant such an increase.

Order reversed and the board directed to authorize special exception with conditions as herein indicated.

Mr. Justice COHEN dissents.