**MARJORIE WEBSTER JUNIOR COLLEGE, INC., Petitioner,**

v.

**DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, Respondent, Neighbors, Inc., et al., Intervenors.**

**Nos. 6640, 7249.**

District of Columbia Court of Appeals.

Argued June 27, 1973.

Decided July 24, 1973.

---

Charles T. Duncan, Washington, D. C., with whom Richard J. Medalie, Laurance J. Ochs, Norman M. Glasgow, Whayne S. Quin and John F. McCabe, Jr., Washington, D. C., were on the brief, for petitioner.

James N. Dulcan, Asst. Corp. Counsel, Washington, D. C., with whom C. Francis Murphy, Corp. Counsel, and Richard W. Barton, Asst. Corp. Counsel, Washington, D. C., were on the brief, for respondent. David P. Sutton, Asst. Corp. Counsel,

Washington, D. C., also entered an appearance for respondent.

Curtis E. Von Kann, Washington, D. C., with whom William O. Bittman, Washington, D. C., was on the brief, for intervenors.

Before KELLY, FICKLING and YEAGLEY, Associate Judges.

FICKLING, Associate Judge:

Petitioner Marjorie Webster Junior College, Inc. (hereinafter, the college), seeks review of an order[1] of the District of Columbia Board of Zoning Adjustment (hereinafter, the Board) which denied petitioner's application for an amendment to its campus plan which would have allowed the college to offer certain short-term, continuing education type courses on a year-round basis.

Aside from the contention that certain findings of fact are not supported by substantial evidence, petitioner's basic complaint is that the Board should have limited its consideration to whether the courses offered by the college were "appropriate for an academic institution of higher learning." After a careful review of these contentions, the record, and applicable law, and after extended and able oral argument, we find no error which requires reversal and, therefore, we affirm.

The college was founded by the Webster family in 1920 and operated until the academic year 1970–1971 as a girls' finishing school. In 1928 it moved to its present location on a 9.5 acre tract, bounded generally by Kalmia Road, 17th Street, and Jonquil Street, N.W. All of this campus lies within an R–1–A zoning district (detached single-family homes with minimum lot dimen-

---

1. Petitioner also challenges a related order of the Board in Appeal No. 6640. However, as counsel for the college conceded, the resolution of Appeal No. 7249 on the merits against petitioner renders a discussion of that order unnecessary. We note also that counsel for the intervenors and for the college entered into a stipulation in Appeal No. 6640 waiving any procedural rights contemplated by the District of Columbia Administrative Procedure Act, D.C.Code 1972 Supp., § 1–1501 et seq.

sions of 75 feet in width and 7,500 total square feet). Its continued existence at this location, after the passage of the Zoning Act of June 20, 1938, D.C.Code 1967, § 5–413 et seq., depended upon the college's complying with Sections 3101.4 and 3101.46 of the Zoning Regulations of the District of Columbia (hereinafter cited as Zoning Reg.).

 These sections allow a "college or university which is an academic institution of higher learning" to exist in a residentially zoned district only if approved by the Board. The Board's approval, however, is not a purely discretionary matter;[2] it is governed by the requirements specified in Zoning Reg. § 3101.46.[3] The Board's discretion is further limited by Zoning Reg. § 8207.2, which mandates that the Board's approval of a special exception (such as that specified by Zoning Reg. § 3101.46) be granted only where "in the judgment of the Board such special exceptions will be in harmony with the general purpose and intent of the zoning regulations and maps and will not tend to affect adversely the use of neighboring property in accordance with said zoning regulations and maps. . ."[4]

---

2. Petitioner's contention that Zoning Reg. § 3101.46 is constitutionally deficient in that it provides no standards sufficient to control the Board's discretionary function and is, therefore, void for vagueness is not well founded. While there must be adequate standards to control the Board's discretion, standards which are *much more general* than those of Zoning Reg. § 3101.46 and § 8207.2 have been upheld. *See* Simeone Stone Corp. v. Oliva, 350 Mass. 31, 213 N.E.2d 230 (1965); Application of Good Fellowship Ambulance Club, 406 Pa. 465, 178 A.2d 578 (1962); Monforte v. Zoning Board of Review, 93 R.I. 447, 176 A.2d 726 (1962); McCloud v. Woodmansee, 165 Ohio St. 271, 59 Ohio Op. 361, 135 N.E.2d 316 (1956). *See also* 3 A. Anderson, American Law of Zoning § 15.09 (1968).

3. That section of the Zoning Regulations reads:

3101.46 College or university which is an academic institution of higher learning including college or university hospital, dormitory, fraternity or sorority house proposed to be located on the campus of a college or university, provided that:

(a) Such use is so located that it is not likely to become objectionable to neighboring property because of noise, traffic, number of students, or other objectionable conditions:

(b) In R–1, R–2, R–3, R–4, R–5–A and R–5–B Districts the maximum bulk requirements normally applicable in such *districts* may be increased for specific *buildings* or *structures* provided the total bulk of all *buildings* and *structures* on the campus shall not exceed the *gross floor area* prescribed for the R–5–B District. In all other residential districts similar bulk increases may also be permitted provided the total bulk of all *buildings* and *structures* on the campus shall not exceed the *gross floor area* prescribed for the R–5–C District. Because of permissive increases as applicable to normal bulk requirements in the low-density *districts* regulated hereunder, it is the intent of this subparagraph to prevent unreasonable campus expansion into improved low-density *districts*.

(c) The applicant shall submit to the Board a plan for developing the campus as a whole, showing the location, height, and bulk, where appropriate, of all present and proposed improvements, including, but not limited to *buildings*, parking and loading facilities, screening, signs, *streets*, and public utility facilities, athletic and other recreational facilities, and a description of all activities conducted or to be conducted therein, and of the capacity of all present and proposed campus development; and,

(d) Within a reasonable distance of the college or university campus and subject to compliance with the provisions of sub-paragraph (a) hereof and paragraph 8207.2 the Board may also permit the interim use of land or improved property with any use which the Board may determine is a proper college or university function; and,

(e) Before taking final action on an application for such use, the Board shall have submitted the application to the National Capital Planning Commission and the Director, Department of Highways and Traffic for review and report. [Emphasis in original.]

4. The zoning regulation which the special exception in this cause must be in harmony with is Zoning Reg. § 3101.1, which reads in pertinent part:

The R–1 District is designed to *protect quiet residential areas* now developed with one-family detached dwellings and adjoining vacant areas likely to be developed for such purposes. The regulations are designed to *stabilize such areas* and to *promote a suitable environment for family life*. . . . [Emphasis added.]

In order to comply with the regulations, the college has, over the past years, sought and received Board approval for several amendments to its campus plan. Zoning Reg. § 3101.46(c). In 1970 the Board again reviewed and approved the college's campus plan. That approval was necessarily predicated on the Board's finding that the college's existence as a "girls' finishing school" is not, nor is it likely to become, objectionable to neighboring property because of noise, traffic, number of students, or other objectionable conditions. Zoning Reg. § 3101.46(a).

In recent years the college suffered financial difficulties due in large part to a steadily dwindling enrollment. Therefore, in the summer of 1971, the college was sold to its present owners, University Research Corporation [5] (hereinafter, URC). URC's stated intent was to "establish a different kind of identity than the one associated with the girls' school." URC's success in establishing this changed identity is the basis of the controversy which culminated in this appeal.

Shortly after taking over control of the college, URC began to conduct new types of programs on the campus. While these programs were extremely varied, they did have certain similarities which distinguished them from the type of curriculum offered prior to the URC takeover. The programs were typically short-term (one semester or less—as short as one day), of a continuing education nature (rather than part of a degree program), and funded by federal grants. The courses were offered year-round and occasionally were taught on weekends and at night. Additionally, the students in the programs were men and women who tended to be older than the girls who attended the college previously.

These changes in the curriculum of the college resulted in a substantial change in the nature of the student body and its rela-

tionship to the surrounding neighborhood. Residents who live near the college had become accustomed to a student body which consisted of several hundred freshman and sophomore girls who moved onto the campus in the fall and remained until summer.[6]

As might be expected in such circumstances, the area residents, through their citizens' associations, tried to ascertain from the college and local zoning authorities just what right it (the college) had to institute these new programs. The citizens' concern was expressed in a series of related zoning administration and court actions. These actions resulted in a Board order which required the college to either remove the programs from the college campus or to file for an amendment to its campus plan. See Zoning Reg. § 3101.46(c). The college appealed this ruling [7] and also filed the amendment.

Hearings were conducted on October 2 and 18, 1972, on the college's request for modification and amendment of its original campus plan. Neighbors, Inc., one of the citizens' organizations, participated as an intervenor at these hearings. The college and Neighbors, Inc., presented voluminous documentation of their respective positions. The college's basic position was and is that as long as it utilizes the same number of buildings, teaches the same number of students (at any one time), and carries on educational activities which are "appropriate for an academic institution of higher learning," the Board simply has no legal right to interfere. Neighbors, Inc., on the other hand, contends that the changes in curriculum have changed the nature of the student body and, in the words of the regulation, this special exception has "become objectionable to neighboring property [owners] because of noise, traffic, number of students, [and] other objectionable conditions." Zoning Reg. § 3101.46(a). Additionally, it is contended that these changes are not in harmony with the general pur-

---

5. The sale was culminated in October of 1971 with Portals, Inc., a wholly owned subsidiary of URC, taking control.

6. No night classes were offered at the college.

7. See note 1 supra.

pose and intent of the zoning regulations. Zoning Reg. § 8207.2.

In support of its contentions, Neighbors, Inc., presented a list of 12 programs it believed were being conducted on the college campus in violation of certain zoning regulations. The college, through testimony of Dr. Frankel, its president, provided the Board with information concerning the programs. Dr. Frankel admitted that one program had in fact been conducted illegally, but he explained that the program had been terminated. His discussion of the other programs provided the basis of the description set out *supra* at 317. He did not dispute the characterization of those programs; however, he was of the opinion that the Board lacked authority to control them so long as they were located so as not to become objectionable to neighboring property because of noise, traffic, number of students, or other objectionable conditions.

The college presented other expert witnesses who testified concerning the above-mentioned standards. A traffic expert, a land use consultant, and the former president of the college, all provided the Board with testimony, which, if believed, would have provided a basis for finding that the new programs were in the regulatory sense "not objectionable." *See* Zoning Reg. § 3101.46(a).

Neighbors, Inc., presented a number of local residents who testified as to their personal knowledge of conditions near the college. While the testimony of these witnesses (pertinent parts of which will be set out *infra*) was rambling and at times imprecise, it clearly was sufficient to raise factual disputes for the Board's resolution concerning objectionable noise, traffic, number of students, and other conditions.

Also in evidence before the Board were the two reports required to be made by Zoning Reg. § 3101.46(e). The report of the Department of Highways and Traffic stated that the Department had "no objections to the proposed development." How-

ever, it emphasized that the rules for student use of automobiles and parking, submitted with the college's application, "should be strictly enforced to prevent extensive student parking on the residential streets in [the] area."

The National Capital Planning Commission likewise voiced no objection

> *provided* that, to insure that the school remains primarily a residential institution of full-time students enrolled on an annual basis and *no short courses or continuing education programs are permitted*, the aggregate number of students enrolled *annually* shall not exceed 550, of which not less than 300 in the academic year 1973–1974, 350 in the academic year 1974–1975, and 375 in the academic year 1975–1976 and in subsequent academic years *shall be residential students*. [Emphasis added.]

In its three briefs before this court and at oral argument of this cause, petitioner primarily relies on a single tri-partite contention. That contention is as follows: (1) That, in view of the circumstances of this case, the only function of the Board at either hearing was to find as a matter of fact whether the courses offered by the college were "appropriate for an academic institution of higher learning," and that the Board's failure to so limit its inquiry resulted in orders that (2) unconstitutionally restrict the curriculum of the college in violation of the First Amendment, and which (3) unconstitutionally discriminate against men and older students. Petitioner's position is untenable on its face.

 The Zoning Regulations of the District of Columbia, as well as those of many jurisdictions, afford no privileged position to colleges or universities. Indeed, other jurisdictions exclude colleges and universities entirely from residentially zoned districts. *See* Yanow v. Seven Oaks Park, Inc., 11 N.J. 341, 94 A.2d 482 (1953). Under our zoning regulations, a college has no right to locate in a residentially zoned district unless it conforms to all of the re-

quirements outlined in Zoning Reg. § 3101.-46. *See* note 3 *supra.* The fact that petitioner offers educational courses which are appropriate for an academic institution of higher learning is simply a bare minimum requirement. In consideration of the fact that the Board did not rest its denial of petitioner's application on the ground that the courses were inappropriate, it can hardly be argued that to not make a finding on appropriateness was error.

Petitioner's First and Fifth Amendment contentions are likewise without merit. To extend logically the petitioner's arguments would allow the college to maintain an agriculture experiment station in the midst of this residential area. One could hardly argue that the keeping of several hundred animals on the campus would be in harmony with the general purpose and intent of the zoning regulations. As for the Board's limitation on age and sex of the students, there simply is no restriction on sex and the age of the students is only a factor to be considered as it relates to other objectionable changes in the character of the student body.

This case, when disrobed of its more elegant trappings, reveals itself to be an admittedly voluminous but relatively uncomplicated zoning matter. The Board, after listening to almost 13 hours of hearings, was required to weigh the evidence of record and to consider the regulatory scheme outlined *supra.* It then issued its order which was accompanied by detailed findings of fact and conclusion of law, as is required by the Administrative Procedure Act, D.C.Code 1972 Supp., § 1-1509(e).

■ Our only duty, then, in reviewing this order is to determine whether detailed findings were made upon each material contested issue of fact, Dietrich v. BZA, D.C.App., 293 A.2d 470 (1972), whether those findings are supported by and in accordance with reliable, probative, and substantial evidence in the whole of the administrative record, Schiffmann v. ABC Board, D.C.App., 302 A.2d 235 (1973), and

whether the conclusions of the Board flow rationally from these findings, Stewart v. BZA, D.C.App., 305 A.2d 516 (1973).

■ Petitioner contends that the Board's Findings No. 16, 17, and 19, are either devoid of any evidentiary support or are not supported by reliable, probative, and substantial evidence. We are unpersuaded.

The Board's Finding No. 16 is as follows:

These programs, have, without Board approval, introduced a large number of transient men and women onto the College property in place of the essentially residential population of young women which had previously constituted the student body of the College.

The college's own testimony, as well as the documentary evidence supplied by it, support this finding. Indeed, it was hardly a disputed fact.

Finding No. 17 states:

Because of short courses of instruction, night and weekend instruction, and so-called "continuing education" offerings, these new programs have resulted in a substantial increase in the total number of people entering and leaving the neighborhood, usually in automobiles.

The college's own evidence indicates that there were a substantial number of short courses of instruction and it was admitted that many of these programs involved evening and weekend instruction. There was, of course, substantial conflict in the testimony as it relates to increased traffic but, if the Board chose to believe the lay witnesses of Neighbors, Inc., instead of the college's paid expert, it was a decision well within its discretion as the fact finder. Additionally, there is no dispute that the total *number* of people entering and leaving the neighborhood increased in view of the fact that there had been only about 120 girls attending the school annually and, now, 2,-400 "students" annually come onto the campus.

In Finding No. 19, the Board found that the grant of the amendment to the campus plan would adversely affect the use of neighboring property in the following ways.

(A) It would substantially increase traffic levels in and around the college.

(B) It would increase the number of cars parked on the streets adjacent to the college.

As set out *supra*, there was substantial evidence in the record on which the Board, as the finder of fact, could rely in resolving this conflict in testimony.

(C) It would increase the noise and level of activity generated on the college property.

There was testimony by one witness that he personally was disturbed by the increased noise, and by another to the effect that the activity at the college was "unbelievable with people coming and going at all times." Additionally, the college admits that, instead of the situation before where the girls moved onto the campus in the fall and stayed until summer, now people are moving in and out of the residence halls *almost daily*. The courses taught now range in length from a day to a full year, with most falling in between. Likewise, the college's testimony indicates that for the first time night courses are being offered at the college and petitioner is trying to increase the number of night students coming to the campus for evening classes only.

(D) It would introduce into the neighborhood a constant flow of new students unacquainted with the college's disciplinary rules and unfamiliar to college officials.

That there would be a constant flow of new students is unquestioned. And, there is no doubt that most would be unfamiliar to college officials. There was evidence of parking violations by students. The testimony of the parent of a former student clearly indicated that if some of the new students were not unacquainted with the college's disciplinary rules, they had little regard for them.

(E) It would cause continuing instability and alarm in the community because of uncertainty about the nature of the uses which could be anticipated on the largest single piece of property in the neighborhood.

The college's application for the amendment to its campus plan simply states that activities to be engaged in will be educational courses appropriate for an academic institution of higher learning. With the college's rather extended view of what constitutes "courses appropriate for an academic institution of higher learning" before it, the Board could reasonably find that the obvious instability and alarm of the neighbors would continue.

In sum, we are of the opinion that the Board's findings were supported by substantial evidence, and the Board's conclusion "that the proposed use of the College's property would not be in harmony with the general purpose and intent of the R–1–A zone and that it would adversely affect neighboring property" flowed logically and rationally from the facts found and is in accordance with the applicable law.[8] The decisions of the Board are therefore

Affirmed—No. 7249; affirmed—No. 6640.

---

8. We have given careful consideration to petitioner's other contentions and find them without merit.