Neil K. DIETRICH et al., on behalf of them-
selves and other residents of their neigh-
borhood organized as concerned Kalorama
citizens, Petitioners,

v.

DISTRICT OF COLUMBIA BOARD OF
ZONING ADJUSTMENT, Respondent,

William W. Baum, Roman Catholic Arch-
bishop of Washington, a corpora-
tion sole, Intervenor.

William W. BAUM, Roman Catholic Arch-
bishop of Washington, a corpora-
tion sole, Petitioner,

v.

DISTRICT OF COLUMBIA BOARD OF
ZONING ADJUSTMENT, Respondent.

Nos. 7161, 7164.

District of Columbia Court of Appeals.

Argued Dec. 18, 1973.

Decided May 22, 1974.

Rehearing Denied in No. 7161 June 13, 1974.

David G. Bress, Washington, D. C., with whom Thomas C. Green, Washington, D. C., was on the brief, for petitioners in No. 7161.

Leo N. Gorman, Asst. Corp. Counsel, Washington, D. C., with whom C. Francis Murphy, Corp. Counsel, and Richard W. Barton, Asst. Corp. Counsel, Washington, D. C., were on the brief, for respondent.

Nicholas D. Ward, Washington, D. C., with whom George E. Hamilton, III and Daniel V. S. McEvily, Washington, D. C., were on the brief, for intervenor in No. 7161 and petitioner in No. 7164.

Before FICKLING, GALLAGHER and HARRIS, Associate Judges.

FICKLING, Associate Judge:

After a remand for a fully reasoned decision based on appropriate findings of fact,[1] this case is before us to review an order of the District of Columbia Board of Zoning Adjustment (BZA) granting the application of Archbishop William W. Baum, as a corporation sole, for a special exception to permit the establishment of Mackin High School, a private school, located at 2200 California Street, N.W.

On appeal petitioners contend that: (1) the BZA acted arbitrarily and capriciously in not finding the neighborhood opposition to the Archbishop's application to be controlling; (2) the findings and conclusions of the BZA are not supported by substantial evidence; and (3) the Archbishop has not met the parking requirement under Article 72 of the Zoning Regulations. We affirm.

The property in question is situated in an area zoned R–5–B (predominant use— medium density apartment house). A private high school may not be located in such an area as a matter of right. The BZA, however, may grant a special exception for a private high school in such an area, if all of the following conditions are met: (1) "where in the judgment of the Board such special exceptions will be in harmony with the general purpose[2] and intent of the zoning regulations and maps" (Zoning Regs. § 8207.2); (2) the exception "will not tend to affect adversely the use of neighboring property in accordance with said zoning regulations and maps" (Zoning Regs. § 8207.2); (3) the school "is so located that it is not likely to become objectionable to adjoining and nearby

---

1. Dietrich v. District of Columbia Board of Zoning Adjustment, D.C.App., 293 A.2d 470 (1972).

2. D.C.Code 1973, § 5–414, provides that the purposes of the Zoning Regulations are:

Such regulations shall be made in accordance with a comprehensive plan and designed to lessen congestion in the street, to secure safety from fire, panic, and other dangers, to promote health and the general welfare, to provide adequate light and air, to prevent the undue concentration of population and the overcrowding of land, and to promote such distribution of population and of the uses of land as would tend to create conditions favorable to health, safety, transportation, prosperity, protection of property, civic activity, and recreational, educational, and cultural opportunities, and as would tend to further economy and efficiency in the supply of public services. Such regulations shall be made with reasonable consideration, among other things, of the character of the respective districts and their suitability for the uses provided in the regulations, and with a view to encouraging stability of districts and of land values therein.

property because of noise, traffic, number of students, or otherwise objectionable conditions" (Zoning Regs. § 3101.42(a)); and (4) there is "ample *parking space*, but not less than that required in Article 72 of these regulations . . . to accommodate the students, teachers, and visitors likely to come to the site by automobile" (Zoning Regs. § 3101.42(b)).

The building at 2200 California Street, N.W., has been owned since its construction in 1904 by the Roman Catholic Archbishop of Washington. Before 1961 the building had been used as St. Rose's Technical School and later as St. Ann's Infant and Maternity Home. As we stated in our prior opinion in this case:

> In 1961 the BZA granted a special exception to the Archbishop to use the premises as a "seminary for the education of young men for the priesthood" for a maximum of 120 students. This use continued until 1971 when the Archbishop decided to cease the use as a preparatory seminary and to relocate Mackin School, a regular private boys' high school, in the building. In order to effectuate this change, the Archbishop applied to the BZA for permission to change the use of the property from a private seminary for the education of young men for the priesthood to a high school for 350 students. . . . [Dietrich v. BZA, D.C.App., 293 A.2d 470, 471 (1972) (footnote omitted).]

A petition for review of the BZA's order granting such a special exception was filed in this court and in *Dietrich, supra,* we vacated that order and remanded the case because the BZA failed to make express findings as to several contested issues of fact and because the BZA failed to give full reasons for its decision.

In conformity with this court's order in *Dietrich, supra,* a rehearing was held on August 30, 1972. Detailed findings of fact and conclusions were thereafter entered supporting the BZA's decision granting the application to establish a private high school for 350 students with no time limitation.

The BZA concluded that Mackin officials took meaningful steps to prevent the school from causing an objectionable increase in noise, traffic congestion, litter, or any other objectionable conditions in the neighborhood. The steps taken by the school include the following: In order to drive to school, students are required to obtain permission from the school officials and if such permission is obtained, they are required to park in the school lot. Students may not take food and beverages from the school cafeteria; they may not leave the school premises during the day without permission; and they may not frequent the nearby grocery store, so as to avoid the possibility of unpleasant incidents. Nighttime basketball games are scheduled at other schools. Trucks are required to make deliveries in the school parking lot. School officials strictly enforce their regulations and maintain the school premises in excellent condition. And, finally, the school makes its facilities available for use by neighborhood groups such as the police department, the Spanish-speaking people of the area, and the Sheridan-Kalorama Citizens Association.

With respect to the effect Mackin has on property values, the BZA found that since Mackin moved to 2200 California Street in September 1971, the apartment occupancy in the neighborhood has remained high; that the only two real estate transactions in evidence, which occurred since September 1971, show a substantial increase in market value of neighboring property; that the structure at 2200 California Street has been used for institutional purposes for many years and, throughout the years, the property values increased substantially; and that the school officials have taken significant steps to make Mackin acceptable to its neighbors. For these

reasons the BZA concluded that the operation of Mackin is not likely to adversely affect property values.

The BZA further concluded that the applicant has provided ample parking space on the premises and that the operation of Mackin "will be in harmony with the general purpose and intent of the zoning regulations and' maps."

Petitioners contend that the application for a special exception should have been denied by the BZA on the ground that the majority of the residents in the neighborhood who expressed an opinion were opposed to the application.

We think that the BZA correctly explained why neighborhood opposition is not a sound basis for denial of a special exception. *See* 3 Anderson, American Law of Zoning § 15.27 (1968). While the BZA recognized that there was significant neighborhood opposition to the application, it explained that its decision must not be controlled by a head count as in a political election. Rather, its decision is controlled by the evidence adduced as it relates to the requirements for a special exception. Since the evidence was sufficient to meet these requirements, the special exception was granted.

Petitioners' next claim—that the BZA's conclusions are not supported by the findings or by substantial evidence—is without merit. On review of a BZA order, we *must determine whether findings* made "are supported by and in accordance with reliable, probative, and substantial evidence in the whole administrative record, Schiffmann v. ABC Board, D.C.App., 302 A.2d 235 (1973), and whether the conclusions of the Board flow rationally from these findings, Stewart v. BZA, D.C.App., 305 A.2d 516 (1973)." Marjorie Webster Junior College, Inc. v. BZA, D.C.App., 309 A.2d 314, 319 (1973). We have examined each finding of the BZA and have found

that they are all supported by probative and substantial evidence on the record and that the conclusions of the BZA flow rationally from these findings.

We consider next Mackin's parking requirement. The Zoning Commission has adopted regulations which set the minimum parking requirement for a private high school. There must be "ample *parking space* but not less than that required in Article *72*" of the Zoning Regulations (Zoning Regs. § 3101.42(b)). Article 72, Section 7202.1 of the Zoning Regulations provides in pertinent part:

| Uses | Amount of *Parking Space* Required |
| --- | --- |
| * * * * | |
| High school and accessory uses: | |
| All districts ..... | Two for each three teachers, plus one for each 20 classroom seats OR one for each ten auditorium seats whichever is greater |

The BZA interprets the "high school and accessory use" provision of Section 7202.1 to require two alternatives: the first is that which precedes the "OR," and the second is that which follows the "OR." The BZA reasons that the word "OR" was intentionally capitalized by the Zoning Commission to serve as a dividing line between the alternatives. Thus, under the BZA's interpretation, the number of parking spaces required is either "two for each three teachers plus one for each 20 classroom seats" or "one for each ten auditorium seats"—whichever alternative is greater.

On the other hand, petitioners do not think the "OR" is the dividing line between the alternatives, but rather interpret the above regulation to require either "two [spaces] for each three teachers plus one for each 20 classroom seats" or "two [spaces] for each three teachers" *and* "one for each ten auditorium seats"—whichever alternative is greater.

Under the BZA's interpretation, a minimum . of 33 parking spaces is required.[3] Since the school premises has at least 39 parking spaces, the BZA concluded that the parking requirements of Article 72 were met.

In contrast petitioners, applying their interpretation to this regulation, compute the minimum number of required parking spaces to be 43.[4] Because the school has parking spaces for 39 cars, they argue the parking requirements of Article 72 have not been met.

■■ When we review the BZA's construction of regulations which were adopted by the Zoning Commission, the BZA's interpretation is controlling unless it is plainly erroneous or inconsistent with the regulation. Taylor v. BZA, D.C.App., 308 A.2d 230 (1973). We think it was reasonable for the BZA to read the "OR" as the dividing line between the alternatives. Consequently, we cannot say the BZA's interpretation of the "high school and accessory use" provision of Section 7202.1 was plainly erroneous or inconsistent with the regulations.

■ Petitioners further contend that the school gymnasium does not come under the "high school and accessory use" provision of Section 7202.1, but instead is a "place of public assemblage" as that term is used in Section 7202.1.[5] Consequently,] they argue that there is the additional parking requirement of one space for each ten gymnasium seats or 36 spaces for the 360 gymnasium seats, which the Archbishop cannot meet.

The BZA rejected this contention, reasoning as follows: Although there are specific types of places listed under the heading "Places of Public Assemblage," a school gymnasium is not among those listed. In addition, the term *accessory use* is defined as "a use customarily incidental and subordinate to the principal use and located on the same lot therewith." (Zoning Regs., Art. 12.) And in the instant case the school gymnasium is an accessory use as that term is defined.

---

3. There are 22 teachers, 350 classroom seats, and 278 auditorium seats. When computing the parking requirement, fractions under $\frac{1}{2}$ space are disregarded but fractions of $\frac{1}{2}$ space or more require one space. (Zoning Regs. § 7207.15.) The BZA computed the parking requirement as follows:

Alternative $1 = 2$ for each 3 teachers plus 1 for each 20 classroom seats
= $\frac{2}{3}$ of 22 + $\frac{1}{20}$ of 350
= 15 + 18
= 33

Alternative $2 = 1$ for each 10 auditorium seats
= $\frac{1}{10}$ of 278
= 28

Since alternative 1 is the greater, a minimum number of 33 spaces is required.

4. Petitioners computed the parking requirement as follows:

Alternative $1 = 2$ for each 3 teachers plus 1 for each 20 classroom seats
= $\frac{2}{3}$ of 22 + $\frac{1}{20}$ of 350
= 15 + 18
= 33

Alternative $2 = 2$ for each 3 teachers plus 1 for each 10 auditorium seats
= 15 + 28
= 43

Since alternative 2 is the greater, a minimum number of 43 spaces is required.

5.

| Uses | Amount of *Parking Space* Required |
|---|---|
| * * * | |

PLACES OF PUBLIC ASSEMBLAGE EXCEPT HOTELS

Churches:

All *districts* ...... No requirement

Arena, armory, assembly hall, auditorium, community center, concert hall, convention hall, dance hall, funeral parlor, ice or roller skating rink, public hall, stadium, or theatre:

C–4 ....... No requirement

All other *districts* ....

One for each ten seats of occupancy capacity for the first 10,000 seats, plus one for each 20 seats above the first 10,000, provided that where seats are not fixed, each seven square feet of *gross floor area* usable for seating shall be considered one seat

Similarly we cannot say the BZA's interpretation of the Commission's regulations was plainly erroneous or inconsistent with the regulations.

■ Lastly, we do not consider the new issues raised by petitioners on appeal concerning the parking requirement since "[a] reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the Commission of an opportunity to consider the matter, make its ruling, and state the reasons for its action." Unemployment Compensation Commission v. Aragan, 329 U.S. 143, 155, 67 S.Ct. 245, 251, 91 L.Ed. 136 (1946) (footnote omitted); accord, J. D. Neumann Properties, Inc. v. District of Columbia Board of Appeals & Review, D. C.App., 268 A.2d 605 (1970). Indeed, this proposition is embodied in the District of Columbia Administrative Procedure Act; in reviewing the BZA's decision, we must look to the *exclusive* record or those portions of it that are designated by the parties. D.C. Code 1973, § 1–1510.

Since we affirm the BZA's order, we need not reach the issues raised by the Archbishop as petitioner in the companion case, Baum v. District of Columbia Board of Zoning Adjustment, No. 7164. The Archbishop concedes that the issues in the companion case are presented for review only if this court decides to reverse or modify the order of the BZA.

Affirmed.

HARRIS, Associate Judge (dissenting):

On the basis of my evaluation of the parking space aspects of this case, I respectfully dissent.

The authority of the Board of Zoning Adjustment (Board) to grant a special exception is limited by the regulations pursuant to which it operates.[1] Since a progression through the relevant regulations is somewhat tortuous, their interrelationship should be recited with specificity.

The property in question is in an R–5–B District (general residence medium density), in an area with a large percentage of single-family dwellings. Section 8207.2 of the Zoning Regulations authorizes the Board to grant a special exception for a private school in any R (residence) District, subject to specific conditions set forth elsewhere in the Regulations, "where in the judgment of the Board such special exceptions will be in harmony with the general purpose and intent of the zoning regulations and maps and will not tend to affect adversely the use of neighboring property in accordance with said zoning regulations and maps." That section is cross-referenced to § 3101.42 of the Regulations. The latter is a part of Article 31, in which are set forth "use regulations for residence districts." Section 3101.42 permits a private school use, again subject to conditions and Board approval,

. . . provided that:

(a) It is so located that it is not likely to become objectionable to adjoining and nearby property because of noise, traffic, number of students, or otherwise objectionable conditions;

(b) Ample *parking space,* but not less than that required in Article 72 of these regulations, is provided to accommodate the students, teachers, and visitors likely to come to the site by automobile. [Emphasis in original.]

In turn, as recited in the majority opinion, § 7202.1 of the Regulations provides that a high school in any district must be provided with the following parking spaces:

Two for each three teachers, plus one for each 20 classroom seats OR one for

1. D.C.Code 1973, § 5–420, empowers the Zoning Commission to provide by regulation that the Board may "make special exceptions to the provisions of the zoning regulations in harmony with their general purpose and intent."

each ten auditorium seats whichever is greater.

Considering these regulations in the aggregate, one conclusion is inescapable: A special exception may not be granted for the location of a high school in a residence district unless the required number of parking spaces is provided. It is my belief that the Board erred in interpreting the Zoning Regulations so as to find compliance on the part of the applicant.

An apparent digression is required at this point. In considering the parking problem, the majority states in part:

> When we review the BZA's construction of regulations which were adopted by the Zoning Commission, the BZA's interpretation is controlling unless it is plainly erroneous or inconsistent with the regulation. Taylor v. BZA, D.C. App., 308 A.2d 230 (1973).

That statement is fully supported by the opinion of this court in the *Taylor* case. D.C.App., 308 A.2d at 232; *see also* Salsbery v. Board of Zoning Adjustment, D.C. App., 318 A.2d 894 (Apr. 30, 1974, at p. 896); Taylor v. Board of Zoning Adjustment, D.C.App., 308 A.2d 230, 232 (1973). As such, it constitutes binding authority in this jurisdiction. M.A.P. v. Ryan, D.C. App., 285 A.2d 310 (1971). Nonetheless, I would be remiss if I did not raise a question as to its complete validity.

The relevant language in Taylor is followed by the citation of Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 65 S. Ct. 1215, 89 L.Ed. 1700 (1945), and accurately characterizes the position taken by the Supreme Court in that case. *See* 325 U.S. at 414, 65 S.Ct. 1215. However, there is a significant difference between the situation which was before the Supreme Court in *Bowles* and that which was before us in *Taylor*—and is before us now.

In *Bowles,* as is true with respect to the great majority of administrative agency cases, the interpretation of the relevant regulation was made by the administrative entity which had been responsible for its adoption. There the Administrator was interpreting *his own regulation,* a process which obviously warrants considerable deference on review. Here, however, the Board was not interpreting its own regulation, but rather one which was adopted by the Zoning Commission. In my view, a considerably more relaxed standard of review should be applicable in such a circumstance.[2]

In any event, irrespective of that question, I consider the Board's interpretation of the relevant regulation to be fatally flawed under any standard of review. Section 3101.42(b) recognizes three categories of persons for whom parking must be provided at a school: students, teachers, and visitors. Teachers comprise an obviously indispensable component of any school, and a significant percentage of them may be expected to drive to work. Consider first the parking requirement of § 7202.1 for nursery school through junior high school, the student populations of which do not include drivers: "Two for each three teachers and other employees except custodial personnel." When the high school level is reached, the student population includes drivers. Hence, in addition to requiring parking for teachers, parking for students must be provided. The following requirement exists for high schools in all districts: "Two for each three teachers, *plus* one for each 20 classroom seats OR one for each ten auditorium seats *whichever is greater.*" (Emphasis added.)

Footnotes 3 and 4 of the majority opinion set forth the figures involved. Fifteen spaces are required for the school's teachers. To that, in my view, must be added

---

2. As stated in 4 K. Davis, Administrative Law Treatise § 30.12, at 258 (1958):

> If the · regulations are issued by one authority and interpreted by another, the problem is much like interpretation and application of statutes, except that legislative history of the familiar kind is not used.

one space for each 20 classroom seats or one space for each ten auditorium seats, whichever is greater. In this case, the auditorium measurement is greater. There being 278 auditorium seats, an additional 28 parking spaces are mandatory, making a total of 43 which would have to exist before the application for a special exception lawfully could be granted. Since the school has only 39 parking spaces, the application should have been denied.[3] The Board's conclusion that only 32 spaces are required—based upon a purported belief that the parking requirements for teachers are not to be considered separately from the spaces required for students and visitors—strikes me as clearly inconsistent with the Regulations, and hence constitutes reversible error.[4]

Since the present shortage amounts to only four parking spaces, a temptation may arise to feel it should be ignored. Yet two compelling reasons exist for adhering to the letter of the regulations. The first is that the question is jurisdictional. The Board has no power to grant a special exception which is not in full compliance with the Zoning Regulations; the application here is not in compliance therewith and hence should have been denied. The second is a matter of policy. The regulations are intended to preserve a basic right of enjoyment to all property owners affected by an application for a special exception. While I fully understand the applicant's desire to utilize its facilities to the fullest, it is precisely that desire which has triggered rather overwhelming neighborhood opposition to the proposal.[5] The record makes clear the extremely difficult parking conditions already existing in the area.[6] Section 3101.42(a) of the Regulations permits the location of a private school in a residence district only if it "is so located that it is not likely to become objectionable to adjoining and nearby property because of noise, traffic, number of students, or otherwise objectionable conditions." In my view, one purpose of the parking space requirement of § 3101.42(b) is to afford a readily ascertainable objective limit beyond which it must be presumed conclusively that a proposed school

---

3. The Board's lack of comfort about the parking space problem is reflected by the subtle differences between two of the applicant's proposed findings and the related findings made by the Board:
    (1) Applicant: The property contains a parking lot which contains space for 39 parking places computed with dimensions of at least 9′ x 19′ per space.
    Board: The property contains a parking lot which contains room for at least 39 regulation size parking spaces. (See Section 7204.1 of the Zoning Regulations). The parking lot contains 45 lined parking spaces. The school parking lot is not filled to capacity during school hours.
    (2) Applicant: The present enrollment in Mackin School is 300 with 22 faculty. The student-faculty rate averages 15 to 1. The application is for a 350 student body. During the last school year the enrollment was 297.
    Board: The present enrollment in Mackin School is 300 with a faculty of 21 teachers. The application is for a student body of 350. During the last school year, the enrollment was 297.
    My reading of the record as a whole convinces me of the accuracy of the applicant's proposed findings as quoted above. Also, of course, if the total student population goes to 350 as proposed, the 278-capacity auditorium will be inadequate and presumably a greater number of teachers will be employed, exacerbating the parking problem.

4. In his written dissent to the earlier grant of the special exception, Board Chairman Scrivener stated in part: "At the new location there are no outside play facilities, and in this crowded area there is not the on-site parking required by the Regulations."

5. In the order granting the special exception which was set aside in our earlier *Dietrich* opinion, the Board made the following finding: "There was massive neighborhood opposition to the granting of the appeal, including a petition containing 500 names." The record now before us reflects increased neighborhood opposition, apparently arising from the fact that the school actually has been operating, with 300 students, at the location for which the special exception was sought.

6. In the order here under review, the Board found: "Nearly all available parking space on streets surrounding [the school] is used at all times of the day, at all times in the year."

operation (as here, for a future total of 350 students) *is* likely to be objectionable to adjoining and nearby property.[7] While it is not for us to determine the wisdom of having a particular school in a particular location, it is our responsibility to determine whether the granting of a particular special exception has been accomplished in full compliance with the applicable regulations. Since I believe that did not occur here, I respectfully dissent.

I make one final observation, speaking *solely for myself with respect to a concept* which was not treated by the parties and which was not the subject of formal consideration by this division of the court. This case is illustrative of a legal situation which is both anomalous and anachronistic. Here we are obliged to review the Board's interpretation of the Zoning Commission's Regulations, with no guidance whatsoever from the Commission itself. This is wholly inconsistent with the concept of exhaustion of administrative remedies which has become so thoroughly established in recent decades.

When Congress created the Board of Zoning Adjustment in 1938, it specifically provided that: "Nothing herein contained shall prohibit the Zoning Commission from providing by regulation for appeals to it from any action of the Board of Zoning Adjustment." D.C. Code 1973, § 5–420. The Commission's response to that invitation was to preclude any right of appeal to it from the Board.[8] Both the Commission and the Board develop significant expertise in handling zoning matters, yet it is only to this progressively more overburdened court that a party aggrieved by Board action may come to seek relief.[9] In this case, the correct interpretation of the Commission's regulations is of decisional significance. I believe it would be a wholly proper exercise of our superintendent jurisdiction over the administrative agencies of the District of Columbia, *see* D.C. Code 1973, § 11–722, *cf.* Winters v. United States, D.C.App., 317 A.2d 530 (Mar. 20, 1974), to withhold decision herein and transmit the case to the Zoning Commission with directions to give us the benefit of its analysis of the questions presented.[10] In the absence of some improvement in the obviously undesirable existing procedures, such an action may well become appropriate in a future case.

7. In its understandable desire to make its proposal acceptable, the applicant has elected to abjure certain of the amenities which normally are a part of school life. Illustratively, no home basketball games are scheduled for the evening hours, and no students or parents from a visiting school are permitted to attend the afternoon home basketball games. All outdoor sports activities must be carried on elsewhere (principally at 16th and Kennedy Streets, N.W.). These limitations are indicative of the difficulties inherent in having a school of this size, with its obviously limited physical facilities, absorbed into the neighborhood.

8. The Commission has provided itself with the mechanism to review Board action, but only on its own motion. Zoning Regulations, §§ 8204.3–8204.5. An aggrieved party before the Board, however, has no right even to call clear error to the Commission's attention.

9. The District of Columbia Court Reorganization Act of 1970 created review jurisdiction in this court over both the Board and the Commission. D.C.Code 1973, § 11–722. Prior thereto, no statutory review procedures existed, and relief from Board actions was sought in the District Court. E. g., see Hot Shoppes, Inc. v. Clouser, 231 F. Supp. 825 (D.D.C. 1964).

10. Congress has provided that one member of the five-member Board shall be a "member of the Zoning Commission or a member of the staff thereof to be designated in either case by such Commission". However, such a factor should not preclude an impartial consideration of a particular question by the full Commission. As noted above, Congress specified that nothing in the statute may be construed to preclude the establishment of procedures permitting an appeal to the Commission from the Board.