THE PRESIDENT AND DIRECTORS
OF GEORGETOWN COLLEGE,
Petitioner,

v.

DISTRICT OF COLUMBIA BOARD
OF ZONING ADJUSTMENT,
Respondent,

Citizens Association of Georgetown
and Hillandale Homeowners
Association, Intervenors.

No. 01–AA–1182.

District of Columbia Court of Appeals.

Argued Oct. 1, 2003.
Decided Dec. 4, 2003.

Deborah B. Baum, with whom Maureen E. Dwyer and Gerard M. Babendreier were on the brief, Washington, DC, for petitioner.

---

* Mr. Reischel died after the brief was filed but before oral argument.

1. For the reader's convenience, the conditions initially imposed by the Board are attached to

Donna M. Murasky, Assistant Corporation Counsel, with whom Arabella W. Teal, Interim Corporation Counsel at the time the brief was filed, and Charles L. Reischel,* Deputy Corporation Counsel at the time the brief was filed, were on the brief, for respondent.

Richard deC. Hinds, with whom L. Burton Davis, Grant P. Felgenhauer, Washington, DC, and Christine A. Hopkinson were on the brief, for intervenor Citizens Association of Georgetown.

Charles R. Braun for intervenor Hillandale Homeowners Association.

Before SCHWELB and GLICKMAN, Associate Judges, and NEBEKER, Senior Judge.

SCHWELB, Associate Judge:

In an order issued on March 29, 2001, and amended on reconsideration on August 6, 2001, the District of Columbia Board of Zoning Adjustment (BZA or the Board) approved the Campus Plan of the President and Directors of Georgetown College (Georgetown or the University), subject to nineteen specific conditions.[1] The University has asked us to review these conditions, contending, *inter alia*, that several of them are not supported by substantial evidence, that some conditions address issues not within the authority or competence of the Board, and that the Board has improperly usurped the University's prerogatives by intruding into the minutiae of university administration.

We agree with the University that on the record in this case, the Board's freezing of enrollment, presumptively until 2010, at the level set in 1990 is not sup-

this opinion as Appendix A. The revised conditions imposed in the Board's order on reconsideration are set forth in Appendix B.

ported by substantial evidence. In addition, some of the other conditions imposed by the Board, most or all of which were designed to control and reduce improper conduct by undergraduates living off-campus—a reasonable and permissible goal—nevertheless go far beyond the proper concerns and expertise of the BZA. Under Condition 8 of the Board's order, for example, the University would be required, for a period of ten years, to seek the Board's consent if it wished to change the composition of the Hearing Board (two faculty members, two students) of the disciplinary body which is responsible for dealing with allegations of off-campus student misconduct. By Condition 6, the BZA requires the University, until 2010, to operate a perpetually staffed "hotline" to receive complaints of student misconduct "24 hours per day, seven days per week." It is not permitted to deviate from this schedule without authorization from the BZA, even though the University has already discovered that the hotline receives a minimal number of complaints and may well learn that, on weekdays, there are virtually no complaints at all. Moreover, Condition 19, as revised, provides that violation of any of the conditions by the University shall be grounds, *inter alia,* for placing a moratorium on any nonresidential on-campus construction and for the imposition of fines or penalties against the University. Such micromanagement of the University's disciplinary code and of other educational activities by an agency whose sole expertise is in zoning is, in our view, inappropriate and unreasonable, especially when it can lead to such draconian sanctions.[2]

The issue before us is complicated, however, by the University's inclusion in its Proposed Findings of Fact, Conclusions of Law, and Order, of some of the very conditions of which it now vociferously complains. Although the University seeks to explain its own proposed order as a compromise proposal, we do not find its arguments in support of this retrospective characterization to be at all persuasive. We must therefore assess the conditions imposed by the Board not only on their own merits, but also in light of the litigation position taken by the University before the Board.

For the reasons stated below, we conclude that some of the conditions to which the University did not consent must be struck down as arbitrary and capricious. In our view, even considering the University's concessions, the Board has involved itself in matters outside its expertise and has intruded to an impermissible degree into the management prerogatives of the University. Accordingly, we vacate the Board's order, as amended on reconsideration, and remand the case for further proceedings consistent with this opinion.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

Founded in 1789, Georgetown is the Nation's oldest Catholic and Jesuit University. Its campus comprises 104 acres within the Georgetown Historic District. Much of the campus is zoned R–3 (low-to-moderate-density residential row dwellings), but parts are zoned C–1 (commercial). To the

---

**2.** A moratorium on non-residential development on the campus, if imposed for a meaningful violation, is not necessarily unreasonable. *See George Washington Univ. v. District of Columbia Bd. of Zoning Adjustment,* 831 A.2d 921, 934–35 (D.C.2003) (*GWU II* ); *see also George Washington Univ. v. District of Columbia, et al.,* 355 U.S.App. D.C. 12, 20, 318 F.3d 203, 211 (2003) (*GWU I* ).

north of the campus lie the residential neighborhoods of Burleith and Hillandale.

According to the Board, as of March 2001, approximately 77% of the University's "traditional undergraduate students" were living on campus.[3] A new 780–bed residence hall, the Southwest Quadrangle, was scheduled to be completed by the fall of 2003. In support of its proposed Campus Plan, the University represented to the BZA that at least 84% of its undergraduates would live on campus by 2010. The University proposed that the previous enrollment cap of 5627, adopted as part of the 1990 Campus Plan, be raised by 389 to 6016 students, but only after the Southwest Quadrangle was ready for occupancy.

At the proceedings before the Board, testimony or written evidence was presented on behalf of the University, the District's Office of Planning (OP), the Department of Public Works (DPW), Advisory Neighborhood Commission (ANC) 2E, and various neighbors and neighborhood groups.[4] Much of the controversy surrounding this case involved the conduct of Georgetown undergraduates who were living off campus, especially in the Burleith and Hillandale communities.

The Board received evidence, both favorable and unfavorable, regarding the activities of Georgetown and its students in the adjoining neighborhoods. Letters supporting the position of the University referred to

the contributions made by the University and its students and faculty, for example, in tutoring elementary school children, providing various types of assistance to public and private schools, teaching adult literacy and other classes,

providing medical outreach services, and assisting economic and human development efforts of community organizations.

Many residents of the surrounding communities, however, complained of what they characterized as

objectionable living conditions caused by students living off-campus, including frequent loud noise; excessive use of alcohol; disorderly behavior; loud late-night parties; parking violations; accumulations of trash and infestations of rats; poor maintenance of properties rented to students by absentee landlords; vandalism and destructive behavior by students, including causing damage to neighbors' houses, yards, and property; the prevalence of group houses occupied by transient students instead of permanent residents; and the overcrowding of large groups of students into single-family residences.

The Board was obviously impressed by the complaints of the neighbors. The Board found that "the number of undergraduate students at the University's campus is having an adverse impact on the surrounding neighborhood[s] because of the frequent occurrence of serious student misconduct off-campus and the displacement of permanent, non-student housing as a result of the lack of sufficient on-campus housing." The Board concluded that, unless preventive action was taken, "the insufficient supply of on-campus housing and the repeated occurrences of off-campus student misconduct" were "likely to exacerbate objectionable impacts on neighboring property ." According to the Board, "pressures associated with the large numbers of undergraduate students

3. The phrase "traditional undergraduate students" does not include students of English as a second language, commuters, or other students not requiring University housing.

4. OP, DPW, and the ANC all supported the University's Campus Plan provided that appropriate conditions were imposed.

threaten [the] livability and residential character" of neighborhoods adjoining Georgetown's campus. The Board noted the anticipated completion of the Southwest Quadrangle project, and welcomed the submission by the University of a new "Off–Campus Student Affairs Program" (OCSAP).[5] Nevertheless, the Board could not find "conclusively"

> that the anticipated new dormitory and implementation of the off-campus program will in fact rectify the adverse impacts described by OP, the affected ANC, and neighborhood parties in opposition.

The Board therefore ordered that "the cap on undergraduate enrollment of 5,627 adopted as part of the 1990 campus plan should be maintained in the approved 2000 campus plan." Returning to the problems complained of by the neighbors, the Board stated:

> The Board believes that the University must direct and guide the conduct of its students when they are living off campus. The policies established in the new Off–Campus Student Affairs program will allow the University to monitor off-campus student activity in a proactive manner to prevent adverse impacts that off-campus student houses or cars may otherwise have on the community. The Board questions whether the off-campus student housing program, as originally proposed, would have sufficient resources to address the problems created by the minority of students whose behavior has caused an adverse impact on the community. With the addition of several conditions specified in this Order, the Board is persuaded that the off-campus student conduct pro-

---

**5.** As described by counsel for the University in a letter to the Board, the OCSAP included the following:

1. An acknowledgment by the University that it will address adverse impacts from students living off campus, including noise, drinking, partying, parking, trash and disrespectful behavior.
2. A clear statement that the University will not tolerate behavior that adversely impacts the surrounding community and reflects poorly on the institution.
3. Clear-cut procedures for educating students living off campus as to their community responsibilities, enforcing the University's new Code of Conduct, and stiffer sanctions and penalties for violations of the Code.
4. The creation of a new neighborhood council, Alliance for Local Living ("ALL"), that would meet with the University to bring issues to the attention of the University and to identify problems and their solutions. This group could also invite representatives from DPW, DCRA and other government agencies, as needed, to share information and ideas and to work together toward community-wide solutions.
5. Increased coordination with the Metropolitan Police Department to assure an in-

stitutionalized and coordinated approach to student conduct issues off-campus. In addition, the University will enhance and increase on-campus events, programs and activities as well as comprehensive alcohol education programs.
6. An implementation plan that outlines immediate actions, short-term and long-term actions that can be monitored, tracked and evaluated. Statistics would be shared with the neighborhood council (ALL) and reported to the Office of Planning and the Zoning Administrator on a yearly basis.
7. In academic year 2004–05 (one full year after the Southwest Quad is projected to be online), the University would update the BZA on the program with identifiable goals and benchmarks to evaluate its success. This ensures that there is an opportunity for short-term review rather than asking the community or the Board to wait until the 10–year expiration of the campus plan. At that time, the Board can impose further conditions on the University if, in its judgment, the program has not proven successful. This places the burden squarely on the University to ensure that the program it has designed works and that its relationship with the surrounding community is positively impacted as a result.

gram is sufficiently comprehensive, that the students will be fully committed to and knowledgeable about the standards of conduct specified in the program, and that the University has committed adequate resources to make the off-campus housing program effective.

The Board then imposed nineteen conditions, several of which are discussed below, and all of which may be found in the Appendices to this opinion.

## II.

## LEGAL ANALYSIS

A. *The regulatory context.*

In our recent decision in *GWU II*, 831 A.2d at 928–29, we quoted as follows from the opinion of the United States Court of Appeals in *GWU I*, 355 U.S.App. D.C. at 14, 318 F.3d at 205:

> The District's zoning scheme for universities, promulgated by the Zoning Commission pursuant to the authority granted by D.C.Code § 6–641 and codified at 11 District of Columbia Municipal Regulations ("DCMR") §§ 210, 302.2 & 507, permits university use as a matter of right in areas zoned for high-density commercial use. For land zoned residential or "special purpose," it permits university use as a special exception. . . . In the areas where university use is by special exception, the owner must secure permission for specific university projects in a two-stage application process. In the first stage, the university submits

a "campus plan" that describes its general intentions for new land use over a substantial period . . . . On approval by the Board—an approval that can be subject to a set of conditions designed to minimize the impact of the proposed development—the campus plan "establish[es] distinct limitations within which all future construction must occur." *Levy v. D.C. Bd. of Zoning Adjustment,* 570 A.2d 739, 748 (D.C.1990). In the second stage, the BZA reviews individual projects that the university proposes to undertake, evaluating them both for consistency with the campus plan and the zoning regulations. *See Draude v. D.C. Bd. of Zoning Adjustment,* 527 A.2d 1242, 1247–48 (D.C.1987).

In the present case, as we have noted, much of the University's campus is zoned for residential use, and the University was therefore required to apply for a special exception.

Under the District's Zoning Regulations, a special exception will be granted if the University can show that the use of the campus, under its Campus Plan, "is not likely to become objectionable .to neighboring property because of noise, traffic, number of students, or other objectionable conditions." 11 DCMR § 210.2 (2003).[6] The BZA was of the opinion that the conditions that it imposed on Georgetown's Campus Plan were necessary to protect the University's neighbors from the kinds of problems identified in § 210.2.[7]

6. The University contends that consideration of the "number of students," as contemplated in the Zoning Regulations, violates the District of Columbia Human Rights Act (DCHRA), D.C.Code §§ 2–1401 *et. seq.* (2001 & 2003 Supp.). The DCHRA generally prohibits discrimination, *inter alia,* on the basis of matriculation; matriculation is defined in pertinent part as "the condition of being enrolled in a college, or university." D.C.Code § 2–1401.02(18) (2003 Supp.). We recently

considered an identical contention in some detail in *GWU II,* 831 A.2d at 938–44, and concluded that the ·DCHRA did not invalidate the zoning regulations. On the authority of *GWU II,* we reach the same conclusion in this case. *See M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971).

7. Citing, *inter alia, Glenbrook Road Ass'n v. District of Columbia Board of Zoning Adjustment,* 605 A.2d 22, 34 (D.C.1992), the Univer-

B. *The standard of review.*

 In *GWU II*, we had occasion to articulate the applicable standard of review:

Our review of the Board's factual determinations is deferential. We must affirm its factual findings if they are based on substantial evidence in the record as a whole. *See* D.C.Code § 2–510(a) (2001); *Georgetown Residents Alliance v. District of Columbia Bd. of Zoning Adjustment,* 816 A.2d 41, 45 (D.C.2003); *Watergate West [v. District of Columbia Bd. of Zoning Adjustment* ], [815 A.2d 762,] 765 [ (D.C.2003) ]. Substantial evidence is relevant evidence which a reasonable trier of fact would find adequate to support a conclusion. *Giles v. District of Columbia Dep't of Employment Servs.,* 758 A.2d 522, 524 (D.C.2000). We must determine (1) whether the agency made a finding of fact on each material contested issue of fact; (2) whether substantial evidence in the record supports each finding; and (3) whether the conclusions of law follow rationally from the findings. *Foggy Bottom Ass'n v. District of Columbia Zoning Comm'n,* 639 A.2d 578, 584–85 (D.C. 1994); *George Washington Univ. v. District of Columbia Bd. of Zoning Adjustment,* 429 A.2d 1342, 1345 (D.C.1981).

The Board's conclusions must be sustained unless they are "[a]rbitrary, capricious,[8] an abuse of discretion, or otherwise not in accordance with law." D.C.Code § 2–510(a)(3)(A) (2001). "It is[, however,] emphatically the province and duty of the judicial department to declare what the law is," *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803), and although we accord weight to the agency's construction of the statutes [and regulations] which it administers, the ultimate responsibility for deciding questions of law is assigned to this court. *Harris v. District of Columbia Office of Workers' Comp.,* 660 A.2d 404, 407 (D.C.1995).

831 A.2d at 931.

 In all appeals and applications to the Board, including applications for a special exception, "the burden of proof shall rest with the appellant or applicant." 11 DCMR § 3119.2 (2003); *Dupont Circle Citizens Ass'n v. District of Columbia Bd. of Zoning Adjustment,* 390 A.2d 1009, 1011 (D.C.1978). The Board, as we have noted, imposed certain conditions on the Campus Plan because it could not find "conclusively" that an adverse impact on the surrounding neighborhoods could be avoided without these conditions. The Board cited

sity argues that the BZA's inquiry should be limited to whether the new Campus Plan would significantly increase the objectionable conditions in the neighborhood. But *Glenbrook Road* was an entirely different kind of case, in which the court was discussing the impact of a proposed new law school on the campus of American University, rather than comparing a proposed Campus Plan with its predecessor. In this case, the University's approach amounts to: "Even if present conditions under the 1990 Campus Plan in the neighboring communities are intolerable, the Board must approve the 2000 Plan unless it is likely to make those conditions considerably worse." We reject such a reading of the regulations as altogether unreasonable.

8. Although the term "arbitrary and capricious" is used both in constitutional due process review and in administrative law review of zoning regulation, constitutional due process review is more deferential. *See GWU II,* 831 A.2d at 931–32 & n. 8 (citing *Pearson v. City of Grand Blanc,* 961 F.2d 1211, 1221 (6th Cir.1992)). *See also GWU I,* 355 U.S.App. D.C. at 13, 318 F.3d at 206 (the Due Process Clause "imposes only very slight burdens on the government to justify its actions"). In the present case, the University initially included a "due process" challenge to the BZA's order, but it has now abandoned that claim.

no authority for a requirement of "conclusiveness," and we know of none.

 This court has stated:

In evaluating requests for special exceptions, the Board is limited to a determination whether the exception sought meets the requirements of the particular regulation on which the application is based. The applicant has the burden of showing that the proposal complies with the regulation; but once that showing has been made, the Board ordinarily must grant the application.

*French v. District of Columbia Bd. of Zoning Adjustment,* 658 A.2d 1023, 1032–33 (D.C.1995) (citations, internal quotation marks, and brackets omitted). Indeed, the burden placed on the University for a special exception "is much lighter than it would be if [it] sought a use variance." *Verona, Inc. v. Mayor & Council of W. Caldwell,* 49 N.J. 274, 229 A.2d 651, 656 (1967); *Carrol's Dev. Corp. v. Gibson,* 73 A.D.2d 1050, 425 N.Y.S.2d 420, 421 (1980), *aff'd,* 53 N.Y.2d 813, 439 N.Y.S.2d 921, 422 N.E.2d 581 (N.Y.1981); 3 EDWARD H. ZIEGLER, JR., RATHKOPF'S LAW OF ZONING AND PLANNING § 61.34, at 61.93–61.96 (2003). This is not a criminal matter, and we are constrained to disagree with the Board's apparent application of a "conclusive" standard of proof.

C. *The BZA's authority.*

 The powers of the BZA are those defined by statute and regulation. *Spring Valley Heights Citizens' Ass'n v. District of Columbia Bd. of Zoning Adjustment,* 644 A.2d 434, 436 (D.C.1994). Specifically, the Board is authorized to "make special exceptions to the provisions of the zoning regulations in harmony with their general purpose and intent." D.C.Code § 6–641.07(d) (2001). The Board also has appellate authority to "hear and decide, in accordance with the provisions of the regulations adopted by the Zoning Commission, requests for[, *inter alia,*] special exceptions." [9] D.C.Code § 6–641.07(g)(2) (2001). The Zoning Regulations vest the Board with "original jurisdiction to grant variances ... and special exceptions ... and to exercise all other powers authorized by the Zoning Act of 1938, [as amended,] ... D.C.Code §§ 6–641.01 to 6–641.15." 11 DCMR § 3100.1 (2003). So far as we can determine, the BZA's authority to "exercise all other powers authorized by the Zoning Act" has no bearing on this case, and no party has argued otherwise. The question in this case is whether the conditions that have been challenged by the University were properly imposed by the Board pursuant to its authority to grant special exceptions.

 "An administrative agency is a creature of statute and may not act in excess of its statutory authority." *Dist. Intown Props., Ltd. v. District of Columbia Dep't of Consumer & Regulatory Affairs,* 680 A.2d 1373, 1379 (D.C.1996). "When [the legislature] passes an Act empowering administrative agencies to carry on governmental activities, the power of those agencies is circumscribed by the authority granted." *Stark v. Wickard,* 321 U.S. 288, 309 & n. 22, 64 S.Ct. 559, 88 L.Ed. 733 (1944) (citing, *inter alia, Marbury v. Madison,* 5 U.S. (1 Cranch at 165)). In the *Spring Valley* case, which presented a question as to the extent of the BZA's authority, we stated that "[t]his court, like other courts, has been reluctant to read into a statute powers for a regula-

---

9. Effective December 8, 2000, the Zoning Commission shall have jurisdiction over applications for special exceptions relating to campus plans. Z.C. Order No. 932, 47 D.C.Reg. 9725 (2000). As explained in *GWU II,* 831 A.2d at 952 n. 32, however, this provision does not apply to proceedings, such as this one, initiated before December 8, 2000.

tory agency which are not fairly implied from the statutory language, since the agency is statutorily created." 644 A.2d at 436 (citation omitted). "Absent express statutory or regulatory authority, a regulatory agency may not impose remedial measures." *Id.* (quoting *Davidson v. District of Columbia Bd. of Med.,* 562 A.2d 109, 112 (D.C.1989)).

 Implicit in the Board's power to grant special exceptions is the authority to place reasonable conditions upon such approval. *GWU II,* 831 A.2d at 928. "Under our zoning regulations, a college has no right to locate in a residentially zoned district unless it conforms to all of the requirements of the [Zoning Regulations]." *Marjorie Webster Junior Coll. v. District of Columbia Bd. of Zoning Adjustment,* 309 A.2d 314, 318–19 (D.C.1973). Because these regulations require that use as a college or university shall be located so "that it is not likely to become objectionable to neighboring property because of noise, traffic, number of students or other objectionable conditions," *id.* at 316 n. 3 (quoting predecessor of 11 DCMR § 210.2), the Board is authorized in approving a campus plan to ensure, by imposing appropriate requirements on the University, that so far as reasonably possible, objectionable conditions such as those enumerated in the regulation will be avoided. *See GWU II,* 831 A.2d at 932–38, 949–52 (approving several such conditions).

D. *Historical perspective.*

The relationship between universities and their neighbors—between Town and Gown—has been the subject of considerable controversy and litigation, and the law has evolved significantly over the years. New York (as well as other jurisdictions)

long considered religious, educational and other institutions to be "favored uses" in residential areas, allowed where other nonresidential uses are not. This approach is entirely consistent with a sort of romantic view of a traditional neighborhood, with a neighborhood park, neighborhood elementary school and two or three houses of worship all carefully integrated into an otherwise entirely residential setting.

7 PATRICK J. ROHAN, ZONING & LAND USE CONTROLS § 40.02, at 40.57 (2003) (footnotes omitted); *see also* David J. Oliveiri, Annotation, *Zoning Regulations as Applied to Colleges, Universities, or Similar Institutions for Higher Education,* 64 A.L .R.3d 1138 (1975 & Supp. 2003). More than half a century ago, the New York Court of Appeals declared that "educational use[s] ... [are] clearly in furtherance of the health, safety, morals and general welfare of the community." *Concordia Coll. Inst. v. Miller,* 301 N.Y. 189, 93 N.E.2d 632, 636 (1950). In *Rutgers State University v. Piluso,* 60 N.J. 142, 286 A.2d 697, 705 (1972), the Supreme Court of New Jersey held "that the growth and development of Rutgers, as a public university for the benefit of all the people of the state,[10] was not to be thwarted or restricted by local land use regulations and that it is immune therefrom." But romantic notions of quaintly traditional neighborhoods and the pristine purity of educational institutions have had to give way to the realities of the modern era, including, *inter alia,* traffic jams, trash accumulation, noise pollution, and the spirited and sometimes rowdy behavior of college students who may have celebrated with a beer or two or ten! In a case involving the renowned

---

10. Georgetown, of course, is a private university, but a private institution can cause problems relating to noise, traffic, and student misbehavior just as readily as any of its "public" counterparts can.

campus situated "far above [Lake] Cayuga's [tranquil] waters," the New York Court of Appeals put it this way:

> The rules governing the relationship between the right of educational institutions to expand and the right of municipalities to regulate land use cannot be fully understood without reference to their background. Historically, schools and churches have enjoyed special treatment with respect to residential zoning ordinances and have been permitted to expand into neighborhoods where nonconforming uses would otherwise have not been allowed. Such favored status once seemed unobjectionable, since elementary schools and small churches serving the surrounding area were welcomed as benefits to the neighborhood. However, the advent of the automobile, as well as the growth and diversification of religious and educational institutions, brought a host of new problems. Sprawling universities brought increased traffic and other unexpected inconveniences to their neighbors, while the benefits these universities conferred were becoming less relevant to the residents of the immediately surrounding areas. Thus, neighbors who may have formerly welcomed the construction of a new school began to view its arrival with distrust and concern that it would unnecessarily bring people from other communities into the neighborhood to disrupt its peace and quiet.
>
> With this change in attitude, courts were thrust into the role of protecting educational institutions from community hostility.

*Cornell Univ. v. Bagnardi*, 68 N.Y.2d 583, 510 N.Y.S.2d 861, 503 N.E.2d 509, 513 (1986).

The dispute between Georgetown and some of its neighbors presents the very problems, concerns, and attitudes identified by the court in the Cornell University case. Generally, in the District of Columbia, as elsewhere, "uses of land for educational purposes are 'highly favored,'" 2 ROBERT M. ANDERSON, AMERICAN LAW OF ZONING § 12.09, at 508 (1986), and it has long been recognized that universities serve the public welfare and morals in important ways." *Glenbrook Road*, 605 A.2d at 32 (citing *Cornell Univ.*, 510 N.Y.S.2d 861, 503 N.E.2d at 514).[11] This court has made it clear, on the other hand, that zoning laws apply to educational institutions, that universities are not immune from land use controls, and that "[t]he Zoning Regulations of the District of Columbia, as well as those of many jurisdictions, afford no privileged position to colleges or universities." *Marjorie Webster*, 309 A.2d at 318. The University has rights and the neighbors have rights, and a temperate, rational, and balanced approach is called for. The BZA's responsibility is "to determine whether a reasonable accommodation has been made between the University and the neighbors which does not interfere with the legitimate interests of the latter," *Glenbrook Road*, 605 A.2d at 32 (or, we are constrained to add, with the legally protected interests of the former).

### E. *The enrollment cap.*

Condition 2 of the BZA's order provides that the University "shall not increase undergraduate enrollment above the cap of 5,627 [traditional students]." The University contends that the Board lacked legal authority to impose any cap at all. In the alternative, the University asserts that even if the BZA did possess such authori-

---

11. We added in *Glenbrook Road* that "a university—even a law school—is not to be presumed, for purposes of the Zoning Regula- tions, to be the land use equivalent of the bubonic plague." 605 A.2d at 32 (footnote omitted).

ty, the cap in the present case was arbitrary and capricious in light of the evidence of record. We reject the first of these contentions but discern merit in the second.

(1) *The Board's authority.*

On or about August 24, 2000, the University, through its counsel, submitted to the Board the University's Proposed Findings of Fact, Conclusions of Law, and Order. The specific order that the University asked the Board to enter stated, in pertinent part, as follows:

[I]t is ORDERED that [Georgetown's] application is GRANTED SUBJECT to the following CONDITIONS:

4. the cap on traditional undergraduate student enrollment remains at 5,627 until the Southwest Quad is brought on-line. At that time, the University may increase undergraduate enrollment to an outside cap of 6,016 (an additional 389 students) provided this increase is phased in over the remaining years of the Plan.

Notwithstanding its own proposal to the Board, the University now contends that the "number of students living in off-campus housing is not a legitimate concern for land-use regulations" and that "enrollment caps are not the province of land-use regulators."

The University relies on *Summit School v. Neugent*, 82 A.D.2d 463, 442 N.Y.S.2d 73 (1981). In that case, a municipal Board of Zoning Appeals imposed a cap of 125 students on a private school as a condition of granting the school a "special use" permit.

The court stated that "municipalities may place reasonable zoning restrictions upon . . . uses carried on by private educational institutions," *id.* at 76, but that conditions "which may intrude upon the educational processes of the [school], as opposed to [its] use of real property, are contrary to public policy." *Id*. at 77. The court went on to hold that "[p]rovisions in a special use permit which '[relate] to the total number of students . . . are invalid, because they apply to details of the operation of the business and not to the zoning use of the premises.'" *Id.* at 79 (citation omitted). The court was further of the opinion that the Board's actions went beyond land use concerns and "impermissibly impinge[d] on the details of the teaching operation of [the] school facility." *Id.* at 76.

█ The Office of Corporation Counsel (which represents the BZA, and which is hereinafter referred to as the District), as well as counsel for intervenor Citizens Association of Georgetown (CAG), contend that *Summit School* is not persuasive authority in the University's favor. These respondents claim that in considering a university's application for a special exception, the BZA is required, under District of Columbia law, to take into consideration, *inter alia*, the "number of students." Therefore, according to the respondents, the Board must necessarily have the authority to impose a cap.[12] Although the merit of this argument is not self-evident, see Part II.E(2), *infra*, we need not decide whether to adopt the analysis in *Summit School* because, in our view, the issue has

---

12. In its brief, CAG argues that

[t]he *Summit School* case has no relevance here. The BZA's authority to regulate—including its authority to approve campus plans—is created by D.C. law. Under that law, the BZA is compelled to consider the number of students that will use a universi-

ty under a special exception. Far from being contrary to the public policy—the foundation of the Court's *Summit School* ruling—the law and policy of the District of Columbia mandate the BZA's consideration of the number of students and permit limitations on those numbers.

not been preserved.[13] Indeed, having asked the Board, presumably for tactical reasons, first to maintain the 1990 cap and then, upon completion of the Southwest Quadrangle, to impose a different cap, the University now says, in effect, that the Board had no right to require that which the University unambiguously invited the Board to include in its order.

■■■ "Courts do not look with favor on abrupt reversals of direction by litigants as they proceed from one court [or other forum] to the next. In general, parties may not assert one theory at trial and another on appeal." *GWU II*, 831 A.2d at 937 (quoting *District of Columbia v. Wical Ltd. P'ship*, 630 A.2d 174, 182 (D.C.1993)) (internal quotation marks omitted). Although this judicial disfavor does not rise to the level of an inflexible rule,[14] the University has cited no comparable case, and we know of none, in which a party has successfully persuaded this court to invalidate a provision which was included in an order at that party's behest. "[I]n the absence of exceptional circumstances, this court will not entertain contentions not raised before the [BZA]." *GWU II*, 831 A.2d at 937 (quoting *Glenbrook Road*, 605

A.2d at 33). We discern no exceptional circumstances here, nor has the University demonstrated that consideration of an enrollment cap would constitute manifest injustice. *Goodman*, 573 A.2d at 1301 n. 21.

In its reply brief, the University claims that its proposed order was offered to the BZA as a "mix" that had to be taken as a whole or rejected as a whole. According to the University,

> [t]he BZA chose to impose only a portion of the mix that Georgetown had proposed, and to engraft additional, fundamentally problematic conditions on top of what Georgetown would have been willing to accept as a compromise position. There was, however, never any concession on Georgetown's part that the BZA would be free to pick and choose from the various conditions, cafeteria-style, leaving some of the proposed conditions out of its order while adding others not acceded to or even discussed by the University.

■■■ We are not persuaded by this contention. A proposed order is not an offer of compromise. If the University, represented by sophisticated counsel, wished to

---

13. In *Summit School,* the court held that even if the applicant's objection to the Board's conditions was not timely raised, "such waiver is ineffectual to foreclose such attack where the right concerns a matter of public policy." 442 N.Y.S.2d at 77. In this jurisdiction, we have been less indulgent than was the court in *Summit School* vis-a-vis failures to raise issues seasonably before administrative agencies. See text of Part II.E. In any event, our zoning regulations arguably reflect a different public policy from the one invoked in *Summit School.*

14. In *Goodman v. District of Columbia Rental Housing Commission,* 573 A.2d 1293, 1301 n. 21 (D.C.1990), this court stated:

A refreshingly candid assessment of the state of the pertinent law is found in Professor Davis' treatise:

The law is not in accord either with an absolute statement that a reviewing court may not decide an issue not raised before the agency or with an absolute statement that a reviewing court may decide such an issue. The law is that the reviewing court has power to exercise discretion in the light of the circumstances and the court's ideas as to what justice requires. [K.C. DAVIS, ADMINISTRATIVE LAW TREATISE 4 § 26.7, at 444 (1983)]. We agree with Professor Davis that a reviewing court has discretionary authority to consider issues which have not been raised before the agency. We join the federal courts in holding, however, that this authority should be exercised only in exceptional circumstances to avoid manifest injustice. *See, e.g., Getty Oil Co . [v. Andrus,* 607 F.2d 253, 256 (9th Cir.1979) ].

negotiate an agreement with CAG or with the District, it could have sent a letter outlining its proposals and position, and could have made clear any reservations upon which its proposals were conditioned. Instead, it submitted a proposed order which included an enrollment cap. It cannot now regain conceded ground by retrospectively recharacterizing the steps that it has taken.

In *GWU II*, George Washington University presented a "package deal" argument which was essentially identical to Georgetown's position here. This court rejected it on grounds equally applicable to the present case:

> The University ... argues, quoting *GWU [I]*, 355 U.S.App. D.C. at 20, 318 F.3d at 211, that while "[n]ormally, a party cannot attack its own proposed agency action, ... presumably that concept would not apply where the proposal was closely tied to some other proposed action that the agency rejected." According to the University, its proposed orders before the BZA "were always put forth for negotiation purposes as a package[ ] deal."

> \*　　\*　　\*　　\*　　\*　　\*

> The University cites nothing in the record to suggest that its proposed population caps were conditional and that it so advised the Board .... "[P]oints ... not asserted with sufficient precision [below] ... will normally be spurned on appeal." *Miller v. Avirom*, 127 U.S.App. D.C. 367, 370, 384 F.2d 319, 322 (1967).

*GWU II*, 831 A.2d at 937–38. If the University was seeking a ruling that the imposition of student enrollment caps is beyond the BZA's authority, it was obliged to say so, "loud[ly] and clear[ly]," to the Board.

Having failed to do that, it cannot, on this record, successfully argue for such a proposition in this court.

*(2) The validity of the specific enrollment cap imposed by the Board.*

■ The University's 1990 Campus Plan, as approved by the BZA, contained an enrollment cap of 5627 "traditional" students. In its plan for 2000–2010, the University initially proposed an increase of 500 undergraduates to 6127, but subsequently modified its proposal (in its proposed order) to an increase of 389 and a cap of 6016.[15] On December 5, 2000, at a public meeting, the Board voted to approve the proposed cap of 6016, conditioned upon the University's agreement to delay the increase in the cap until after the Southwest Quad was in place.

When the Board issued its written order on March 29, 2001, however, it reversed its previously announced decision to authorize a delayed increase. Instead, the Board decided to retain, presumptively until 2010, the cap of 5627 undergraduates that it had imposed as a condition of the 1990 Campus Plan. In a footnote to its order of March 29, 2001, the Board described this change as a "clarification" of its intent when it took the earlier vote:

> At its public meeting held December 5, 2000, Board members Robert Sockwell, Sheila Cross Reid, and Anne Renshaw voted to approve a condition that would have permitted the University to increase enrollment once the Southwest Quadrangle was completed. At the Board's executive session held March 27, 2001, those members and Commissioner Herbert Franklin, who had heard all the testimony, voted to modify Condition No. 2 of this Order to clarify its intent

---

**15.** It appears that at the relevant time, the University's enrollment was 5516, or 111 students below the cap. The University thus changed its proposal from the cap plus 500 to actual enrollment plus 500.

with respect to alleviating adverse impacts on surrounding neighborhoods associated with the number of students living off-campus.

The same evidence that, in the Board's initial view, had warranted the approval of a small phased increase—an average of thirty-nine additional undergraduates per year, for ten years, totalling slightly less than one half of the capacity of the new 780–bed Southwest Quadrangle complex—was now suddenly perceived by the BZA as requiring it to proscribe any increase at all.

We find little, if any, support in the record for the finding that the modest enrollment increase initially authorized but subsequently disapproved by the Board would have contributed to or exacerbated objectionable conditions in the adjoining neighborhoods. The BZA's ultimate refusal to permit the proposed increase may have been influenced by the Board's apparent but erroneous theory that the University's showing of no adverse impact on neighboring communities must be "conclusive." In any event, the Board's own Findings of Fact reflect the following:

1. The DPW was of the opinion that a gradual increase in the student population would have "negligible impact on the traffic and parking due to its small increase and limited automobile usage";

2. The OP submitted a report recommending approval of the University's application for a 389–student increase in enrollment following completion of the Southwest Quadrangle, provided that the University would be required to take reasonable steps (including more on-campus housing and a strengthened off-campus student program) to counteract

objectionable conditions in adjoining neighborhoods; and

3. ANC 2E passed a resolution supporting the proposed phased-in enrollment increase of 389 students after the completion of the Southwest Quadrangle, provided that at least 85% of the University's undergraduates would live on-campus, and provided also that the University would undertake certain other measures, including an expanded off-campus program, to protect the interests of non-student residents of communities adjoining the campus.

Especially in light of the views of the DPW, the OP, and the ANC, it is significant that the Board made no findings "of a basic or underlying nature," *Palmer v. Bd. of Zoning Adjustment*, 287 A.2d 535, 538 (D.C.1972), explicating how a small and gradual increase in enrollment, under a plan which significantly increased the number of students living on campus and reduced the need for off-campus housing, would adversely affect the adjoining neighborhoods. In their briefs, the District and CAG appear to assume that because the zoning regulations require the BZA to include the "number of students" in its calculus, the freezing of the University's enrollment at a level imposed twenty years before the expiration of the current Campus Plan must necessarily be proper.

We do not agree. First, without necessarily viewing all of the court's reasoning in the *Summit School* case, 442 N.Y.S.2d at 75–79, as applicable to the District of Columbia, we are of the opinion that the imposition by the BZA of an enrollment cap at least approaches (if, indeed, it does not cross) the line between the exercise of legitimate zoning and land use authority [16] and an *ultra vires* intru-

16. Because the order under review was issued by the Board of *Zoning* Adjustment, it is worth noting the following definition of "zoning":

sion upon the University's educational mission. We therefore consider it imperative that, in order to justify a freeze on enrollment under the circumstances presented here, the BZA must make reasonably detailed underlying evidentiary findings in which it specifically identifies the need for continuing the 1990 cap and describes in non-conclusory terms the manner in which the retention of the cap would protect the residents of the adjoining communities.

Our decision in *Washington Ethical Society v. District of Columbia Board of Zoning Adjustment*, 421 A.2d 14 (D.C. 1980), is instructive on this issue. In that case, the BZA declined to permit a private school to increase its enrollment from sixty-five students to eighty. The Board found that the proposed measure would "adversely impact ... the surrounding property by 'increasing noise, litter, traffic and other adverse impacts'" and would prevent the neighborhood from enjoying the benefits of a single-family area in harmony with an R–1–A zoning." *Id.* at 16. This court reversed:

[N]owhere in the record is there a rational basis for the Board's conclusion that the addition of 15 students would cause the school to become objectionable and inconsistent with R–1–A zoning.

\* \* \* \* \* \*

There are no findings of fact of a "basic or underlying nature" about the future impact of an increased student body on noise and traffic in the Shepherd Park area. [Citing *Palmer*, 287 A.2d at 538.] The Board's findings are "[generalized], conclusory (and) incomplete." *Dietrich v. District of Columbia [Bd.] of Zoning Adjustment*, 293 A.2d 470, 473 (D.C.1972). They appear to be based on lay observations of current conditions, not future impact . . . .

\* \* \* \* \* \*

Although the Board finds that petitioners' school now has 65 students and that the school exceeds its occupancy certificate by 25 students, the finding is in limbo. *Nowhere in the record is there any evidence which distinguishes the impact of 40 students from the impact of 65 students or 80 students.* There is no indication of whether the Board found adverse effects attributable to the 25 students who exceed the current occupancy certificate or to the 15 who might be added.

*Id.* at 16–17 (emphasis added). The court rejected as altogether inadequate the Board's conclusory finding that existing problems "would be magnified if petitioners' application were granted." *Id.* at 17.[17]

In the present case, during the discussion of the proposed increase in the enrollment cap among the members of the Board, one member framed the issue in somewhat earthy terms:

[T]he shoe is really pinching the university when you say that you are focusing

The legislative division of a region, esp. a municipality, into separate districts with different regulations within the districts for land use, building size, and the like. BLACK'S LAW DICTIONARY 1612 (7th ed.1999); *see also* 101 A C.J.S. *Zoning and Land Planning* § 2(a) (1979).

17. The District and CAG attempt to distinguish the *Washington Ethical Society* decision upon the ground that, in the present case, there is ample evidence, and it is effectively conceded, that Georgetown students were responsible for some of the objectionable conditions that plagued the residents of Burleith and other communities. The Board did not, however, confront with any specificity the precise issue—whether, and how, a minimal yearly increase in enrollment, to begin after the opening of on-campus housing for twice as many students as the total proposed ten-year increase, would significantly affect conditions in the neighboring communities.

on this issue of increasing enrollment, because that as I understand it is what they think they need, in terms of revenue for operations.

And I think if we say that is where the shoe is pinching, and until you can improve that situation, we won't allow you to increase enrollment, I think we are doing what the *community wants done.*

(Emphasis added.) Although the BZA initially voted to approve the requested increase, the speaker's position, as we have seen, ultimately prevailed. While the words quoted above do not necessarily reflect the views of every member of the Board, or even of the Board as a whole, it is significant that the focus of these remarks was not on whether the modest proposed increase, in itself, would adversely affect the neighboring communities. Rather, it was on the use of the cap as a means by which the Board could place financial pressure on the University and could make Georgetown's "shoe pinch" until the University did what, in this Board member's view, "the community" wanted done.

But the manner in which the zoning regulations are to be enforced cannot depend even on scientifically conducted public opinion polls, and certainly not on speculation as to what some undefined "community" may find desirable. We conclude that the record lacks substantial evidence supporting the BZA's freeze of the University's enrollment, potentially until 2010, at the level set in 1990.

F. *The Off–Campus Student Affairs Program (Conditions 3–10).*

Because the principal concern of the residents of communities adjoining Georgetown's campus relates to the presence and conduct of Georgetown students living in those communities, the University pro-posed a comprehensive Off–Campus Student Affairs Program (or OCSAP), see note 5, *supra,* which was designed to accommodate the neighbors' concerns. Much of the crossing of swords between the parties in this case has concerned the manner in which the Board dealt with the OCSAP.

The University claims, in essence, that it negotiated in good faith and that it was rewarded for its public-spirited approach by being effectively ambushed by the Board. Indeed, the Board's attitude, as perceived by Georgetown, was that no good deed by the University should go unpunished. The University's position is stated as follows in its brief:

In addition to seeking to minimize the number of students in surrounding neighborhoods, the Order imposes on Georgetown unprecedented responsibility for oversight of the District's regulation of off-campus conduct and housing of students and their landlords. This is a stark example of an underlying irony in this case, *i.e.,* that the University has voluntarily developed and committed to pro-active measures to educate its students concerning the dictates of local law and considerate community living and to respond to errant behavior on their part. *The Order, however, seeks to convert the University's good faith efforts, which were carefully tailored to function within the University's educational and administrative framework, into more expansive, governmentally-dictated policies and procedures.* One of the fundamental principles at issue here is that the BZA ignored the critical difference between a university's prerogative to adopt internal educational and disciplinary measures, and a governmental agency's authority to impose its

own enforcement responsibilities and priorities upon the institution.

(Emphasis added.)

Although the University's position is understandable, we do not believe that its basic complaint can be reconciled with a fair reading of the record. Paragraph 7 of the proposed order which the University submitted to the Board, and which it asked the Board to enter, reads in pertinent part, as follows:

The New Off–Campus Student Affairs Program described in Exhibit ___ of the record and attached hereto is incorporated in this Order and these conditions as though fully set forth herein, *and shall be enforceable in the same manner as any other condition contained in this Order.* That Off–Campus Program includes sanctions for enforcement of the University's Code of Conduct as well as a reporting mechanism to the community, OP and the Zoning Administrator in order to monitor its progress.

(Emphasis added.) The University cannot persuasively argue that the Board improperly converted the University's "good faith efforts" into "governmentally-dictated policies and procedures" when, through counsel, Georgetown proposed to the BZA that the OCSAP—the University's own synopsis of its "good faith efforts"—should be made an enforceable part of the Board's order.

■ The University also argues in its brief, citing *National Black Child Development Institute v. District of Columbia Board of Zoning Adjustment,* 483 A.2d 687, 691 (D.C.1984), that "[z]oning authorities simply have no business regulating the operations of a university rather than regulating its use of land." Whatever merit

there might be in this argument in the abstract, or if the University had taken this position at the outset,[18] the point has surely been waived in this case. In its own proposal, the University has affirmatively invited the BZA to "regulate [Georgetown's] operations" by making compliance with the OCSAP an enforceable part of the Board's order. The University cannot now be permitted to make a 180–degree turn, *i.e.,* to claim in this court that the OCSAP—a program which obviously relates to Georgetown's operations and not to its land use—is none of the BZA's business. Given the University's position before the agency, this is not a suitable case for striking down with a meat axe every condition imposed by the Board that is not strictly confined to the regulation of the use of land.

Nevertheless, the Board's order contains several quite problematic provisions to which the University did not consent. Further, the order involves the Board in the details and mechanics of the University's enforcement of student discipline and other similar concerns—matters in which a zoning body lacks any specialized competence. These details and mechanics—in some instances they are justifiably described by the University as "minutiae"— are far removed from the BZA's expertise and area of responsibility. Further, under the terms of the order as written, the University is precluded, presumptively until 2010, from revising or modifying, without the BZA's consent, any of the conditions and procedures imposed by the Board. In the event that the University fails to comply with any of these conditions, then under Revised Condition 19, it faces a potential moratorium on further on-campus construction, it risks the revo-

---

**18.** We note that in any event, the zoning regulations plainly authorize the Board to consider a Campus Plan's potentially objec-tionable impact on neighboring communities. 11 DCMR § 210.2.

cation of previously granted building permits and certificates of occupancy, and it is subject to possible fines and penalties. We enumerate in this Part II.F of the opinion several conditions that, in our view, constitute legally unwarranted agency intrusion into the University's management prerogatives:

### 1. Condition 6.

 This Condition requires the University to operate a hotline for complaints, seven days a week, twenty-four hours a day, and to keep a detailed record of every complaint received. The hotline must be staffed at all times by a live operator. By contrast, the University had proposed a hotline with far more limited hours of operation. On its face, the Board's order requires the BZA's consent for any modification of the hotline's hours, even if the University should discover, *e.g.*, that the hotline receives no calls, or very few calls, during weekdays and weeknights, or mornings.[19] We conclude that the BZA's imposition of an "around-the-clock" staffed hotline is arbitrary and irrational, and that this Condition is unrelated to the BZA's expertise and does not promote the goal of a reasonable accommodation between the University and its neighbors.[20]

### 2. Condition 7.

 Condition 7, which is set forth in Appendix A, requires the University to undertake extensive investigations of any violations of housing or sanitation regulations affecting students living off-campus. The University is also required to engage in extensive reporting to various agencies and to monitor what the other agencies have or have not done about any alleged violations. In its motion for reconsideration by the Board, the University stated:

> [T]o the extent that the BZA purports to require the University to "monitor enforcement" of various sanitation and housing regulations, and thereby effectively requires it to take on the regulatory burden delegated to various District agencies, we believe that the Order goes far beyond what can reasonably be imposed on a private institution.

We agree with the University. Although the District and CAG claim that the University proposed or agreed to the substance of Condition 7, we do not believe, viewing the University's position as a whole, that the respondents' claim is substantiated by the record. We cannot sustain Condition 7 as written.[21]

19. The record shows that during the ninety-one days between January 7 and April 7, 2002, the hotline received a total of sixty-eight calls—well under one per day. The number of confirmed incidents reported was nineteen—about one every five days. Each of these problems could have been reported to the police or to some other municipal agency. Although there is no breakdown between weekends and weekdays, these statistics alone suggest that the operation of the hotline twenty-four hours a day, seven days a week, does not come close to being cost-effective. To require the University to secure a *zoning* agency's approval if it seeks to modify the hotline's hours of operation is, in our view, altogether unreasonable.

20. The District and CAG point to a submission by the University which describes Condition 6 as "consistent with the procedures that Georgetown already follows or is already implementing." In the same submission, however, the University "question[ed] the appropriateness of the Board's dictating the substantive and procedural details of the University's disciplinary code." On balance, we do not believe that the University waived its right to object to Condition 6.

21. Georgetown complains that the portion of Condition 7 requiring it to report violations of sanitation or housing regulations "to the housing provider, the Department of Consumer and Regulatory Affairs, Department of Public Works, or other agency as appropriate"

### 3. *Condition 8.*

 Condition 8 reads as follows:

The [University] shall ensure that complaints are heard by a Hearing Board comprising two students and two faculty members, reflecting the University's recognition of the seriousness of complaints about student misconduct.

It appears that this extraordinary intrusion into the University's disciplinary procedures was precipitated by the following observation by one of the members of the Board:

*I believe* that the composition of the hearing board, with community complaints should be the same as any other complaint where the severity is regarded by the university as great.

(Emphasis added.) To the extent that this comment represented the position of the BZA, it substituted the Board's view for the University's on a matter of educational policy far removed from zoning considerations.

The BZA's expertise in land use issues does not, in our view, translate into special competence regarding the proper staffing

of a University's disciplinary body. Moreover, under the terms of the BZA's order, the University is powerless to alter the composition of the disciplinary hearing board without the zoning agency's consent. In its motion for reconsideration, the University stated, in pertinent part: "We question whether the BZA intended to dictate that level of detail and to attempt to manage the University's internal business ...." The question is a reasonable one. We conclude that Condition 8 is unreasonable, arbitrary and capricious.

### 4. *Condition 10.*

 This Condition requires the University to "report a violation of the Code of Conduct to the parents or guardians of the violator to the extent permitted by law." The University had adopted what it has described as a "tiered disciplinary system that included notification of parents, to the extent permitted by law, *in some instances of particular violations.*" Georgetown designed this system "to balance competing interests of student privacy and self-

forces the University to violate the Federal Educational Rights and Privacy Act of 1974 (FERPA), 20 U.S.C. § 1232g, by mandating the release of allegedly protected information regarding students who live off campus. If the reporting obligations are held to be invalid, this may also remove at least a part of the reason for imposing the obligation to investigate.

FERPA protects students' privacy interests by withholding federal financial assistance to educational institutions that have "a policy or practice of permitting the release of educational records" or "personally identifiable information contained therein other than directory information," unless disclosure is permitted by an exception to the Act. *Id.* at § 1232g(b)(1). Georgetown first raised its FERPA-based objections to the reporting obligations imposed on it by Conditions 7 and 14 in its response to the neighborhood organizations' motion for reconsideration; it char-

acterized these objections as "additional questions and concerns" regarding the BZA's order. In its Order on Reconsideration, the BZA declined to entertain Georgetown's FERPA claim because the neighborhood organizations and the District had no opportunity to respond to it.

Because we are remanding the case to the Board in any event for further proceedings, and because all parties will have an opportunity on remand to be fully heard on the applicability *vel non* of FERPA, we shall defer any decision on this issue until the Board addresses it in the first instance on remand. It may be that the Board will succeed in fashioning a remedy that is substantially as effective as Condition 7 without the potential of violating FERPA (*e.g.,* the BZA might limit the University's reporting obligation to apply only to complaints received by the University's Department of Public Safety, *see id.* at § 1232(a)(4)(B)(ii)).

determination against interests of safety and discipline."

The balancing described above is, in our view, a responsibility more appropriately left to the University than to the BZA. We conclude that Condition 10 is arbitrary and capricious.[22]

### G. *The parking cap.*

█ The University's 1990 Campus Plan, as approved by the BZA, provided for an on-campus parking cap of 4080 spaces. In the 2000 Plan which it proposed to the Board, the University stated, *inter alia:* "This 2000 plan maintains the [University's] commitment [to reduce traffic traversing through local neighborhoods] ... *by maintaining the campus parking cap.*" (Emphasis added.) The University added that "[t]he campus parking supply is limited to a maximum capacity of 4080 spaces."

Curiously, in Condition 15 of its original order of March 29, 2001, the BZA converted the cap (or maximum) of 4080 spaces into a floor (or minimum). Expressing concern that "the supply of off-street parking on campus may be insufficient to ensure that the surrounding neighborhoods are not adversely affected by University-related parking that may spill over from campus to the neighborhoods," the Board ordered the University to "maintain *at least* 4,080 off-street parking spaces within the campus boundaries" to avoid encouraging additional cars off-campus. (Emphasis added.) In other words, the Board's position suddenly changed, in substance, from

"4081 spaces are too many" to "4079 spaces are too few."

The affected community groups had received no notice that this startling change from cap to floor was being contemplated. Led by intervenor Hillandale Homeowners Association, the University's neighbors requested the BZA to reconsider its order. Their request was supported by the Office of Planning and by the Department of Public Works. The proponents of the motion pointed out that all of the traffic studies in the record supported or presupposed the continuation of the cap, which the University had itself proposed. Indeed, the University's expert witness on traffic had testified that the campus plan (with the cap of 4080 spaces) "will not have an adverse effect on traffic or parking in the area" and that "[f]irst and foremost, the University will maintain its 4080 space parking cap." Notwithstanding his testimony, however, the University opposed the motion for reconsideration, thus putting itself in the unusual position of being the only adversary of the plan which it had itself proposed.

In response to the motion for reconsideration, the BZA apparently recognized that it had made a mistake. One of the Board members stated:

I think that the record would not support the language that is in our order at the present time, which says that [the University] shall maintain *at least* 4,080 off-street parking spaces. *I believe that was a drafting error* and is not supported by the evidence in the record.

---

22. Without going into detail, we also conclude that the University, and not the BZA, should decide, *inter alia,*

 1. how often students living off campus should be required to attend community education workshops (Condition 3(c));

 2. how frequently the Code of Student Conduct should be distributed (Condition 4(b)); and

 3. whether a complaint should be brought before the Hearing Board when the complainant no longer wishes to pursue it (Condition 5).

(Emphasis added.) [23] In its order of August 6, 2001, and apparently in conformity with the "drafting error" analysis, the Board wrote that

> upon reconsideration, [the Board] concurs with the neighborhood associations, OP, and DPW that Condition 15 should be revised to reflect that the supply of off-street parking places on campus *should not exceed 4080.*

(Emphasis added.) The Board then revised Condition 15 in its August 6, 2001, Order on Reconsideration to read as follows:

> The Applicant shall maintain a parking inventory of 4,080 off-street parking spaces within the campus boundary, and shall ensure that not more than one percent of the parking inventory is taken out of service at any one time.

The University now argues that in finally adopting the cap of 4080 spaces urged by the University and its traffic expert, the Board acted upon "factually unsupported estimates and suppositions of University neighbors, which were based on nothing more than their own preconceived and generalized notions of parking problems in the area." In light of the history that we have recited, the University's position is not well taken. We conclude that Revised Condition 15, if construed as a cap and only as a cap, would be supported by substantial evidence and would not be arbitrary or capricious.

Notwithstanding the imprecise phrasing of Revised Condition 15, and its omission of "no more than," or words to that effect, we would be disinclined under most circumstances to agree with the University that the Board's Order on Reconsideration requires the University to provide 4080 spaces, "no more and no less." Such a construction would ignore the preceding discussion in the Board's order and would be contrary to common sense; the BZA could not have meant, one would suppose, that the University must provide *precisely* 4080 spaces. Nevertheless, the language of Revised Condition 15 tends to support the improbable construction placed on it by the University, for the inclusion of the provision that no more than one percent of the parking inventory may be out of service at any one time makes no sense unless the 4080 spaces were intended as a minimum.[24] Because, in our view, this number cannot reasonably be both a maximum and a minimum, we must vacate Revised Condition 15 and direct the Board, on remand, to clarify it.

### H. *Registration of student-owned automobiles.*

Revised Condition 14 reads as follows:

> The Applicant, through its Office of the Registrar, shall maintain an accurate record of the license plate numbers of motor vehicles kept by all University students. The Applicant shall direct its students to register their vehicles in the District of Columbia, or obtain a reciprocity sticker if eligible to do so, and shall consult with the D.C. Department of Motor Vehicles to determine whether such registration is completed or such stickers are obtained. The Applicant shall withhold parking privileges to students who do not comply with D.C. registration requirements. Failure to abide

---

**23.** This notion of a "drafting error" cannot readily be reconciled with the Board's stated concern, in its original order, "that the supply of off-street parking on campus may be insufficient" to protect adjoining neighborhoods.

**24.** The University states in its brief that it does *not* challenge the requirement that it "ensure that not more than one percent of the parking inventory is taken out of service at any one time."

by District law concerning registration of student vehicles shall constitute a violation of the Code of Student Conduct.

The most controversial aspect of this Revised Condition has become moot, for the District of Columbia Department of Motor Vehicles has stated that it would not find a list of student-owned vehicles to be useful. *See GWU II,* 831 A.2d at 938 n. 14.[25]

One might reasonably question whether the information-collection provisions and related disciplinary requirements of Revised Condition 14 promote in any major way the goal of avoiding objectionable conditions in neighborhoods adjoining Georgetown's campus. CAG defends Revised Condition 14 as follows:

> The Motor Vehicle Registration requirements of [Revised] Condition 14 ensure that the University's students comply fully with D.C. law; they also discourage students from obtaining illegally the right to park on the streets of neighborhoods surrounding the University. Indeed, by impeding illegal registration and parking practices, the condition discourages students from bringing vehicles to the University at all and limits the adverse traffic and parking impacts caused by those vehicles.

Although this argument may be less than compelling—the connection between Revised Condition 14 and the problems of Burleith and other communities is, at best, indirect—the University has not, in our view, satisfied its formidable burden of showing that Revised Condition 14 is arbitrary or capricious. *Accord, GWU II,* 831 A.2d at 938 n. 14. On remand, however, the BZA may wish to take a fresh look at this provision to determine whether it is likely to accomplish what it was apparently designed to achieve.

## III.

## CONCLUSION

■■■ The University asks this court simply to invalidate those conditions imposed by the Board which we hold to be legally improper, and then to order the approval of the University's Campus Plan without these conditions. We do not believe that such a remedy is appropriate.

In *Federal Power Commission v. Idaho Power Co.,* 344 U.S. 17, 73 S.Ct. 85, 97 L.Ed. 15 (1952), the FPC granted a license for a hydroelectric project on certain specific conditions, which were designed to ensure that applicable federal requirements would be satisfied. Concluding that the Commission had no authority to impose these conditions, the United States Court of Appeals ordered that they be stricken from the Commission's order and that the license be issued without them. The Supreme Court reversed, holding that the appellate court had exceeded its own authority by effectively rewriting the terms of the license. Instead, the Supreme Court explained, the Court of Appeals should have remanded the case to the Commission for further proceedings consistent with the court's opinion:

> When the [Court of Appeals] decided that the license should issue without the conditions, it usurped an administrative function. There doubtless may be situations where the provision excised from the administrative order is separable from the remaining parts or so minor as to make remand inappropriate. *But the guiding principle, violated here, is that the function of the reviewing court ends when an error of law is laid bare. At that point the matter once more goes to the Commission for reconsideration.*

**25.** Georgetown's claim that the portion of Condition 14 requiring the University to "con-

sult with the D.C. Department of Motor Vehicles" violates FERPA is therefore also moot.

*Id.* at 20, 73 S.Ct. 85 (emphasis added). The circumstances here are at least arguably analogous.

In any event, we have concluded in this case that a number of the conditions imposed by the BZA cannot be sustained. The Board, and not the court, is in the best position to formulate appropriate conditions which are consistent with applicable legal requirements as set forth herein. Accordingly, the decision of the BZA is vacated, and the case is remanded to the Board for further proceedings consistent with this opinion.

*So ordered.*

### APPENDIX A

CONDITIONS IMPOSED BY THE DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT IN ITS ORDER OF MARCH 29, 2001

1. The Applicant's proposed campus plan is approved until December 31, 2010, subject to the following conditions in tended to mitigate any adverse impacts potentially arising from the location of a university use in a residentially zoned district.

2. The Applicant shall not increase undergraduate enrollment above the cap of 5,627. This cap shall apply to traditional full-time undergraduate students; that is, undergraduate students who require housing.

3. The Off–Campus Student Affairs Program implemented and enforced by the Applicant shall specify that off-campus housing is a privilege that can be revoked due to student misconduct, whether a violation occurs on-or off-campus.

a) The Applicant shall ensure that the Off–Campus Student Affairs Program is fully funded and staffed, and shall obtain the endorsement of the University's Board of Directors for the program and its implementation.

b) The Off–Campus Student Affairs Program shall specify the measures that University personnel shall undertake, immediately upon receiving a complaint regarding student misconduct, to resolve any objectionable behavior pending the University's investigation of a complaint.

c) The Off–Campus Student Affairs Program shall conduct at least annually a community education workshop that is mandatory for all students living off-campus.

4. The Off–Campus Student Affairs Program shall adopt and enforce a Code of Student Conduct.

a) The Code of Student Conduct shall clearly describe appropriate standards of behavior, delineate misconduct that constitutes a violation of the Code, and specify the sanctions that will be imposed for violations, particularly with respect to the consequences of repeated violations.

b) The Applicant shall distribute copies of the Code of Student Conduct to students at least annually, and shall require students to certify in writing that they agree to adhere to the Code.

5. The Code of Student Conduct shall provide that, once a complaint is received concerning a student's off-campus conduct, a University officer (*e.g.* the Vice President for Student Affairs or Assistant Dean for Off–Campus Student Affairs) shall determine whether probable cause exists to bring the complaint before a Hearing Board, thereby relieving the original complainant of the obligation to pursue the matter.

6. The Applicant shall maintain a telephone hotline to receive complaints regarding student misconduct. The

hotline shall be staffed 24 hours per day, seven days per week, by University personnel who shall keep a detailed record of each complaint received and shall forward each complaint to the appropriate authorities for immediate response.

7. When the Applicant, upon investigation of a complaint or by any other means, receives evidence of a violation of sanitation or housing regulations involving or affecting students living in an off-campus residence, the Applicant shall report the violation to the housing provider, the Department of Consumer and Regulatory Affairs, Department of Public Works, or other agency as appropriate. The Applicant shall monitor enforcement of reported violations to determine whether necessary inspections have occurred and whether fines have been issued and paid, and shall keep detailed records of reported complaints and responses.

8. The Applicant shall ensure that complaints are heard by a Hearing Board comprising two students and two faculty members, reflecting the University's recognition of the seriousness of complaints about student misconduct.

9. The Applicant shall make publicly available data indicating the number and types of complaints received concerning student misconduct, and the outcome of each complaint, including whether sanctions were imposed and whether any fines paid. The Applicant shall also report this information quarterly to the Office of Planning, the Zoning Administrator, ANC 2E, and the Alliance for Local Living, and to other interested community organizations that may request the information.

10. The Applicant shall report a violation of the Code of Conduct to the parents or guardians of the violator to the extent permitted by law.

11. The Applicant shall avoid scheduling events that attract large numbers of visitors to the campus during the peak traffic times of 7 a.m. to 9 a.m. and 4 p.m. to 7 p.m. The Applicant shall employ campus personnel as necessary to direct visitors to campus parking areas and to ensure smooth flow of traffic into and out of the campus.

a) All weekday evening performances at the Performing Arts Center expected to draw more than 100 visitors shall begin no earlier than 7 p.m.

b) Athletic events at Harbin Field expected to draw over 100 visitors shall begin before 4 p.m. or after 7 p.m.

12. The Performing Arts Center, Harbin Field, and McDonough Arena shall be used for purposes related to the University or the community, and not for non-University events whose primary purpose is revenue generation.

13. The helipad shall be used only for medically necessary purposes. The Applicant shall provide monthly reports regarding use of the helipad, including credible evidence of medical necessity associated with its use, to ANC 2E, the Alliance for Local Living, and other community organizations that request the information.

14. The Applicant, through its Office of the Registrar, shall maintain an accurate record of the license plate numbers of motor vehicles kept by all University students. The Applicant shall direct the students to

register their vehicles in the District of Columbia, or obtain a reciprocity sticker, and shall consult with the D.C. Department of Motor Vehicles to determine whether such registration is completed or such stickers are obtained. The Applicant shall withhold parking privileges to students who do not comply with D.C. registration or reciprocity requirements. Failure to register student vehicles in the District or to obtain reciprocity stickers shall continue a violation of the Code of Student Conduct.

15. The Applicant shall maintain at least 4,080 off-street parking spaces within the campus boundary to avoid encouraging additional cars off campus.

16. The Applicant shall enhance its Transportation Management Program:

a) to promote greater transit usage, including increased ridership of the GUTS bus service;

b) to provide additional parking in satellite locations linked to the campus by shuttle bus;

c) to work with the community, MedStar, and the Department of Public Works as part of a cooperative team effort to look at mitigation strategies for Reservoir Road.

17. The Applicant shall include, in all future applications for further processing of the campus plan, the following information:

a) actual enrollment of traditional undergraduate students, as of 30 days prior to the hearing date, including documentation and an explanation of the methods and assumptions used in the calculation;

b) whether the Southwest Quadrangle project has been completed, and, if so, the date it began use as an undergraduate dormitory;

c) a progress report on the implementation and operation of the Off–Campus Student Affairs Program, including information on number of complaints received concerning student misconduct, reported violations, and outcomes, including what sanctions were imposed and the fines paid, if any;

d) the number of off-street parking spaces within campus boundaries, as of 30 days prior to the hearing date, including documentation and an explanation of the methods and assumptions used in the calculation; and

e) a status report on the Transportation Management Program.

18. The Applicant shall prepare a revised campus plan that is consistent with this Order and shall submit an original and 10 copies of the revised plan to the Board no later than 90 days from the effective date of this Order. The revised plan shall be accompanied by a table of changes that lists each page on which a change appears, and describes each change. The Board shall certify the revised copy as the approved campus plan. Copies of the approved plan shall be maintained in the Office of Zoning and the Office of the Zoning Administrator.

19. No special exception application filed by the University for further processing under this plan may be granted unless the University proves that it has consistently remained in substantial compliance with Conditions 1 through 18 set forth in this Order. Further, any violation of a condition of this Or-

der shall be grounds for the denial or revocation of any building permit or certificate of occupancy applied for by, or issued to, the University for any University building or use within the campus boundary, and may result in the imposition of fines and penalties pursuant to the Civil Enforcement Act, D.C.Code §§ 6–2701 to 6–2723.

## APPENDIX B

REVISED CONDITIONS IMPOSED BY THE DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT IN ITS ORDER ON RECONSIDERATION OF AUGUST 6, 2001

1. The Applicant's proposed campus plan is approved until December 31, 2010, subject to the following conditions intended to mitigate any adverse impacts potentially arising from the location of a university use in a residentially zoned district, or until such time prior to December 31, 2010 as the Zoning Commission determines that conditions warrant submission of an updated campus plan or grants a request to amend the plan.

14. The Applicant, through its Office of the Registrar, shall maintain an accurate record of the license plate numbers of motor vehicles kept by all University students. The Applicant shall direct its students to register their vehicles in the District of Columbia, or obtain a reciprocity sticker if eligible to do so, and shall consult with the D.C. Department of Motor Vehicles to determine whether such registration is completed or such stickers are obtained. The Applicant shall with-hold parking privileges to students who do not comply with D.C. registration requirements. Failure to abide by District law concerning registration of student vehicles shall constitute a violation of the Code of Student Conduct.

15. The Applicant shall maintain a parking inventory of 4,080 off-street parking spaces within the campus boundary, and shall ensure that not more than one percent of the parking inventory is taken out of service at any one time.

18. The Applicant shall prepare a revised campus plan that is consistent with this Order, accompanied by a table of changes that lists each page on which a change appears and describes each change. The Applicant shall submit an original and 10 copies of the revised plan to the Board no later than 90 days from the effective date of this Order, and shall, on the same day, serve a copy of the revised plan and table of changes on each party to this proceeding. Each party shall have 30 days in which to submit to the Board, and to serve on all other parties, its comments on the Applicant's proposed changes. Comments on the revisions shall be strictly limited to whether the revisions correctly and clearly reflect the Order. After review of the Applicant's proposed revised plan and the parties' comments, the Board shall determine whether further proceedings are warranted or shall certify the revised plan as the approved campus plan. The revised plan shall be deemed approved 60 days after submission, absent action by the Board before that date. Copies of the approved plan shall

be maintained in the Office of Zoning and the Office of the Zoning Administrator.

19. No special exception application filed by the University for further processing under this plan may be granted unless the University proves that it has consistently remained in substantial compliance with Conditions 1 through 18 set forth in this Order. Further, any violation of a condition of this Order shall be grounds for the denial or revocation of any building permit or certificate of occupancy applied for by, or issued to, the University for any University building or use approved under this plan, and may result in the imposition of fines and penalties pursuant to the Civil Enforcement Act, D.C.Code §§ 6–2701 to 6–2723.